## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **Chapter 11** |
| **CRYPTOMETRICS, INC.,** | § | |
| | § | |
| Debtor. | § | **CASE NO. 10-53622** |
| | § | |

## DISCLOSURE STATEMENT FOR THE DEBTOR'S CHAPTER 11 PLAN

Christopher Adams
M. Renee Moxley
OKIN ADAMS & KILMER LLP
1113 Vine Street, Suite 201
Houston, TX 77002
(713) 228-4100 Telephone
(888) 865-2118 Facsimile

ATTORNEYS FOR CRYPTOMETRICS, INC.

September 17, 2010

**THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES OR REJECTIONS OF THE PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DOCUMENT IS BEING SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

**DISCLAIMER**

THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") AND ITS RELATED DOCUMENTS ARE BEING USED IN CONNECTION WITH THE SOLICITATION OF VOTES ACCEPTING THE CHAPTER 11 PLAN FOR CRYPTOMETRICS, INC. (THE "DEBTOR") DATED SEPTEMBER 17, 2010 (AS MAY BE AMENDED, THE "PLAN") PROPOSED BY THE DEBTOR.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, EVENTS IN THE CHAPTER 11 CASE AND FINANCIAL INFORMATION. THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN OR SUCH STATUTORY PROVISIONS, DOCUMENTS OR FINANCIAL INFORMATION, BUT IS RATHER INTENDED ONLY TO AID AND TO SUPPLEMENT SUCH REVIEW. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED PROVISIONS SET FORTH IN THE PLAN (WHICH IS ATTACHED HERETO AS <u>EXHIBIT A</u>). IN THE EVENT OF A CONFLICT BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN SHALL GOVERN. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS IN VOTING CLASSES ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND TO READ CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS ATTACHED HERETO, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR TO REJECT THE PLAN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF. THE PLAN PROPONENT DOES NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING THE FINANCIAL INFORMATION, IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE SOLICITATION PERIOD PURSUANT TO THIS DISCLOSURE STATEMENT WILL EXPIRE AT 4:30 P.M. (CENTRAL TIME) ON [_____], 2010 (THE "VOTING DEADLINE"). TO BE COUNTED, BALLOTS MUST BE ACTUALLY RECEIVED IN ACCORDANCE WITH THE VOTING INSTRUCTIONS BY DEBTOR'S COUNSEL ON OR BEFORE THE VOTING DEADLINE. PLEASE SEE SECTION I.B OF THIS DISCLOSURE STATEMENT FOR VOTING INSTRUCTIONS. BALLOTS WILL NOT BE ACCEPTED VIA FACSIMILE OR ELECTRONIC MAIL.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE BANKRUPTCY RULES AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAW OR OTHER NON-BANKRUPTCY LAW. HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF

THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. EACH SUCH HOLDER SHOULD, THEREFORE, CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE PLAN, AND THE TRANSACTIONS CONTEMPLATED THEREBY.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED AS AN ADMISSION, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING.

IF THE BANKRUPTCY COURT CONFIRMS THE PLAN AND IT BECOMES EFFECTIVE, ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS (INCLUDING THOSE WHO REJECTED OR WHO ARE DEEMED TO HAVE REJECTED OR ACCEPTED THE PLAN AND THOSE WHO DID NOT SUBMIT BALLOTS TO ACCEPT OR TO REJECT THE PLAN) SHALL BE BOUND BY THE TERMS OF THE PLAN.

# TABLE OF CONTENTS

**I.**     **INTRODUCTION** ................................................................................ 1

      **A.**    **General** ................................................................................ 1

      **B.**    **Voting Instructions and Procedures** ........................................ 1

          **1.**    **Voting Procedures, Ballots and Voting Deadline** ................ 1

          **2.**    **Voting Record Date** ........................................................ 2

          **3.**    **Incomplete Ballots** ........................................................ 3

          **4.**    **Defects, Irregularities, Etc.** ............................................ 3

          **5.**    **Withdrawal of Ballot** ...................................................... 3

      **C.**    **Confirmation Hearing** .......................................................... 4

      **D.**    **Recommendation of Debtor** .................................................. 4

**II.**    **CERTAIN EVENTS PRECEDING THE DEBTOR'S CHAPTER 11 FILINGS** ........................................................................................ 4

      **A.**    **Business, Corporate and Financial Overview** ........................ 4

      **B.**    **Other Debtor Related Matters** .............................................. 6

          **1.**    **CryptoMetrics Canada, Inc.** ............................................ 6

          **2.**    **United Arab Emirates** ...................................................... 7

      **C.**    **Litigation Against the Debtor** .............................................. 8

      **D.**    **Decision to File Chapter 11** .................................................. 8

      **E.**    **Proposed Sale** ...................................................................... 8

      **F.**    **Claims of the Debtor** ............................................................ 9

      **G.**    **Liquidating Plan** .................................................................. 9

**III.**   **EVENTS DURING THE CHAPTER 11 CASE** ................................ 9

      **A.**    **Continuation of Business** ...................................................... 9

      **B.**    **Retention of Okin Adams & Kilmer LLP as Bankruptcy Counsel** ............... 10

      **C.**    **DIP Loan Provided by SCG** ................................................ 10

      **D.**    **Sales And Marketing Process** .............................................. 10

**IV.**   **SUMMARY OF THE PLAN** ........................................................ 10

      **A.**    **Introduction** ........................................................................ 10

      **B.**    **Sale Alternative Confirmation.** ............................................ 10

      **C.**    **Classification of Claims** ...................................................... 11

      **D.**    **Treatment of Claims and Equity Interests and Summary of Distributions Under the Plan** ................................................ 12

          **1.**    **Administrative Expense Claims** ...................................... 12

              **a.**    **Allowed Administrative Expense Claims** .................. 12

              **b.**    **Requests for Allowance of Administrative Expense Claims.** ...................................................................... 13

          **2.**    **Priority Tax Claims** ........................................................ 13

              **a.**    **Schedule of Payments** ............................................ 13

|   |   | b. | Other Provisions Concerning Treatment of Priority Tax Claims | 13 |
|---|---|---|---|---|
|   | 3. |   | Summary of Classification and Treatment of Holders of Allowed Claims and Equity Interests that are Placed in Classes | 14 |
| E. |   |   | Distribution Provisions | 18 |
|   | 1. |   | Distributions | 18 |
|   | 2. |   | Distributions of Cash | 18 |
|   | 3. |   | Distributions on a Subsequent Distribution Date | 18 |
|   | 4. |   | Distributions on the Final Distribution Date | 18 |
|   | 5. |   | Delivery of Distributions and Undeliverable Distributions | 18 |
|   | 6. |   | Time Bar to Cash Payments and Disallowances | 19 |
|   | 7. |   | Minimum Distributions | 19 |
|   | 8. |   | Transactions on Business Days | 19 |
|   | 9. |   | Distributions After Allowance | 19 |
|   | 10. |   | Disputed Payments | 19 |
|   | 11. |   | No Distribution in Excess of Allowed Amount of Claim | 19 |
| F. |   |   | Means for Execution of the Plan | 20 |
|   | 1. |   | Cancellation of Equity Interests and Re-Issuance of New Common Stock. | 20 |
|   | 2. |   | Dissolution of Corporate Entities. | 20 |
|   | 3. |   | Vesting of Property of the Estate in the Liquidating Debtor | 20 |
|   | 4. |   | Plan Agent | 20 |
|   |   | (a) | Identity From and After the Effective Date. | 20 |
|   |   | (b) | Responsibilities and Powers of the Plan Agent. | 20 |
|   |   | (c) | No Bankruptcy Court Approval. | 22 |
|   |   | (d) | Compensation of Plan Agent and its Professionals | 22 |
|   |   | (e) | Resignation | 23 |
|   |   | (f) | Removal | 23 |
|   |   | (g) | Appointment of Successor Plan Agent | 23 |
|   | 5. |   | Plan Administration Reserve | 23 |
|   | 6. |   | Further Orders | 23 |
|   | 7. |   | Post-Effective Date Reports, Final Decree. | 23 |
|   | 8. |   | Discharge of Plan Agent | 24 |
|   | 9. |   | Corporate Action | 24 |
|   | 10. |   | Release of Liens. | 24 |
|   | 11. |   | Exemption from Certain Transfer Taxes and Recording Fees | 24 |
|   | 12. |   | Withholding and Reporting Requirements | 25 |
|   | 13. |   | Periodic Reports and United States Trustee's Fees | 25 |
|   | 14. |   | Assignment and Prosecution of Rights of Action. | 25 |
|   |   | a. | Notice to Prosecutable Targets. | 25 |
|   |   | b. | Reservation of Rights of Action. | 26 |
|   |   | c. | Notice in Confirmation Order. | 26 |
|   |   | d. | Discretion to Pursue or Settle and Immunity of the Parties | 26 |
|   | 15. |   | Provisions Relating to Default | 27 |
|   |   | a. | Default of Plan | 27 |

|  |  | b. | Remedies in Case of Default | 27 |
|  |  | 16. | Closing of the Debtor's Case | 27 |
|  | G. | Conditions Precedent to Effectiveness of Plan | | 27 |
|  |  | 1. | Conditions to the Effective Date | 27 |
|  |  | 2. | Waiver of Conditions | 28 |
|  | H. | Treatment of Executory Contracts and Unexpired Leases | | 28 |
|  |  | 1. | Rejection of Executory Contracts and Unexpired Leases | 28 |
|  |  | 2. | Bar Date for Filing Rejection Claims | 28 |
|  |  | 3. | Provisions Relating to Assumption Cure Claims. | 28 |
|  | I. | Procedures for Resolving and Treating Disputed Claims | | 28 |
|  |  | 1. | Objections to Claims | 28 |
|  |  | 2. | No Distribution Pending Determination of Allowance of Disputed Claims; Distributions to be Made on Undisputed Balances of Partially Disputed Claims. | 29 |
|  |  | 3. | Reserve Accounts for Disputed Claims | 29 |
|  |  | 4. | Investment of Disputed Claims Reserve | 29 |
|  |  | 5. | Allowance and Payment | 29 |
|  |  | 6. | Release of Excess Funds from Disputed Claims Reserve | 30 |
|  |  | 7. | Estimation | 30 |
|  | J. | Modification of Plan | | 30 |
|  | K. | Allocation of Plan Distributions Between Principal and Interest | | 30 |
|  | L. | Post-Confirmation Actions, Reports and Final Decree | | 30 |
|  |  | 1. | Reports of Distribution | 30 |
|  |  | 2. | Final Report. | 31 |
|  |  | 3. | Request for Post-Confirmation Notices and Filings. | 31 |
| V. | CONFIRMATION OF THE PLAN | | | 31 |
|  | A. | Introduction | | 31 |
|  | B. | Voting | | 31 |
|  | C. | Acceptance | | 32 |
|  | D. | Confirmation of the Plan | | 32 |
|  |  | 1. | Best Interests of Holders of Claims and Equity Interests | 33 |
|  |  | 2. | Feasibility | 34 |
|  |  | 3. | Acceptance by Impaired Classes | 34 |
|  |  | 4. | Cram Down | 34 |
|  |  | 5. | Classification of Claims | 35 |
|  | E. | Effect of Confirmation of the Plan | | 35 |
|  |  | 1. | Revesting of Assets | 35 |
|  |  | 2. | Discharge of the Debtor | 35 |
|  |  | 3. | No Waiver of Discharge | 36 |
|  |  | 4. | Binding Effect | 36 |
|  |  | 5. | Term of Injunctions or Stays | 36 |
|  |  | 6. | Setoffs | 36 |
|  |  | 7. | Exculpation | 37 |
|  |  | 8. | Indemnification | 37 |
| VI. | CERTAIN RISK FACTORS TO BE CONSIDERED | | | 38 |

     **A.**     **Risk that Distributions will be Less than Estimated by the Debtor** .............. 38

     **B.**     **Risk of Non-Confirmation of the Plan** ............................................................... 38

     **C.**     **Non-Consensual Confirmation of the Plan** ..................................................... 38

     **D.**     **The Sale May Not Close** ..................................................................................... 38

**VII.**    **CERTAIN TAX CONSEQUENCES OF THE PLAN** ................................................. 39

**VIII.**   **CONCLUSION AND RECOMMENDATION** ............................................................. 40

## EXHIBITS TO DISCLOSURE STATEMENT

Exhibit A     -     Debtor's Chapter 11 Plan

Exhibit B     -     Rights of Action

# I.      INTRODUCTION

## A.      General

CryptoMetrics, Inc. ("Debtor") filed a petition for relief under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code") on September 17, 2010 (the "Petition Date").

The Debtor submits this disclosure statement (this "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code, for use in the solicitation of votes on the Debtor's Chapter 11 Plan (the "Plan").  A copy of the Plan is attached as <u>Exhibit A</u> to this Disclosure Statement. All capitalized terms not otherwise defined in this Disclosure Statement shall have the meanings set forth in the Plan.

This Disclosure Statement sets forth certain information regarding the Debtor's prepetition operating and financial history, its need to seek chapter 11 protection, significant events that have occurred during its chapter 11 Case, and the alternatives for either the liquidation or reorganization of the Debtor under the Plan.  This Disclosure Statement also describes terms and provisions of the Plan, including certain alternatives to the Plan, certain effects of confirmation of the Plan, and the manner in which distributions will be made under the Plan.  In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims and Interests entitled to vote under the Plan must follow for their votes to be counted.

## B.      Voting Instructions and Procedures

### 1.      Voting Procedures, Ballots and Voting Deadline

With respect to Classes of Claims and Equity Interests that are Impaired under the Plan, each holder of an Allowed Claim or Interest in such a Class will receive this Disclosure Statement, the order approving the Disclosure Statement, the Plan, the notice of the Confirmation Hearing and a Ballot for voting the acceptance or rejection of the Plan (unless deemed to reject the Plan).

Under the Plan, all holders of Claims against the Debtor in Classes 2, 3, 5, 6 and 7 (the "Voting Classes") are Impaired and entitled to vote on the Plan.  Holders of Claims in Class 1 DIP Lender Claims and Class 4 Priority Claims are Unimpaired under the Plan and are deemed to have accepted the Plan.  For a description of the Classes of Claims and Equity Interests and their treatment under the Plan, see Article 5, "Treatment of Classes of Claims and Equity Interests."

Only Persons who hold Claims or Equity Interests on the Record Date (as defined below) are entitled to receive a copy of this Disclosure Statement.  Only persons who hold Claims in the Voting Classes on the Record Date are entitled to vote on whether to accept the Plan.

Separate pre-addressed return envelopes have been supplied for the Ballots.  Holders of Allowed Claims and Allowed Equity Interests in the Voting Classes should take care to use the proper pre-addressed envelope to ensure that Ballots are returned to the proper address.

PLEASE CAREFULLY FOLLOW THE DIRECTIONS CONTAINED ON EACH ENCLOSED BALLOT. ALL VOTES TO ACCEPT OR TO REJECT THE PLAN MUST BE CAST BY USING THE BALLOT ENCLOSED WITH THIS DISCLOSURE STATEMENT. In order for a Ballot to be counted, it must be completed, signed and sent to Counsel for the Debtor (the "Balloting Agent") **so as to be received by the Voting Deadline (4:30 p.m. Central Time on [_____], 2010)** at the following address:

OKIN ADAMS & KILMER LLP
Attention: M. Renee Moxley
1113 Vine Street, Suite 201
Houston, TX 77002

If you are a holder of an Allowed Claim or Allowed Equity Interest in a Voting Class and (i) did not receive a Ballot, (ii) received a damaged Ballot, (iii) lost your Ballot, (iv) have any question about balloting procedures, or (v) wish to obtain, at your own expense, (unless otherwise specifically required by Bankruptcy Rule 3017(d)), an additional copy of the Plan or this Disclosure Statement, please contact:

OKIN ADAMS & KILMER LLP
Attention: M. Renee Moxley
1113 Vine Street, Suite 201
Houston, TX 77002

ONLY PROPERLY COMPLETED AND SIGNED BALLOTS RECEIVED BY THE BALLOTING AGENT PRIOR TO THE VOTING DEADLINE WILL BE COUNTED FOR PURPOSES OF DETERMINING WHETHER EACH VOTING CLASS HAS ACCEPTED THE PLAN. ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED ABSENT THE EXPRESS WRITTEN CONSENT OF THE DEBTOR NOR WILL ANY BALLOTS RECEIVED BY FACSIMILE OR ELECTRONIC MAIL BE COUNTED WITHOUT THE EXPRESS WRITTEN CONSENT OF THE DEBTOR. The Debtor will prepare and file with the Bankruptcy Court a certification of the results of the balloting with respect to the Plan.

**Your vote on the Plan is important. The Bankruptcy Code requires as a condition to confirmation of a plan that each class that is impaired under such plan vote to accept such plan, unless the "cram down" provisions of the Bankruptcy Code are satisfied. *See* Section V.D.4, "Cram Down."**

**2.      Voting Record Date**

The record date for voting on the Plan is the close of business (prevailing Central time) on [_____], 2010 (the "Record Date"). Only holders of Claims and Equity Interests in the Voting Classes as of the Record Date are entitled to vote to accept or reject the Plan.

### 3.    Incomplete Ballots

Any Ballot received that is not signed or does not indicate either an acceptance or a rejection of the Plan shall be an invalid Ballot and shall not be counted for purposes of determining acceptance or rejection of the Plan.

### 4.    Defects, Irregularities, Etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots will be determined by the Debtor in its sole discretion, whose determination will be final and binding. Unless the Ballot being furnished is timely filed by the Voting Deadline, together with any other documents required by such Ballot, the Debtor may reject such Ballot as invalid and, therefore, decline to use it in connection with seeking confirmation of the Plan by the Bankruptcy Court. In the event of a dispute with respect to a Ballot, any vote to accept or reject the Plan cast with respect to such Ballot will not be counted for purposes of determining whether the Plan has been accepted or rejected, unless the Bankruptcy Court orders otherwise. The Debtor reserves the right to reject any and all Ballots not in proper form. The Debtor further reserves the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot. The interpretation (including the Ballot and the respective instructions thereto) by the Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with delivery of a Ballot must be cured within such time as the Debtor (or the Bankruptcy Court) determines. Neither the Debtor nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failing to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.

### 5.    Withdrawal of Ballot

All properly completed, valid Ballots will be irrevocable upon the Voting Deadline. Prior to the Voting Deadline, any holder of a Claim who has delivered a valid Ballot may withdraw its vote by delivering a written notice of withdrawal to the Balloting Agent so as to be received by the Balloting Agent before the Voting Deadline. To be valid, the notice of withdrawal must (a) describe the Claim to which it relates, (b) be signed by the party who signed the Ballot to be revoked, and (c) be received by the Balloting Agent by the Voting Deadline. Withdrawal of a Ballot can only be accomplished pursuant to the foregoing procedure. Prior to the Voting Deadline, any holder of a Claim who has delivered a valid Ballot may change its vote by delivering to the Balloting Agent properly completed subsequent Ballot so as to be received before the Voting Deadline. In the case where more than one timely, properly completed Ballot for the same Claim(s) is received by the Voting Deadline, only the Ballot that bears the latest date will be counted. After the Voting Deadline, a vote of the holder of a Claim may only be changed or withdrawn with the authorization of the Bankruptcy Court upon a showing of "cause" pursuant to Bankruptcy Rule 3018(a).

C.  **Confirmation Hearing**

The Bankruptcy Court will hold a hearing on confirmation of the Plan (the "Confirmation Hearing") commencing at [_____] prevailing Central time on [_____], 2010, before the Honorable _____, United States Bankruptcy Judge for the Western District of Texas, San Antonio Division, Courtroom ____, 615 E. Houston Street, P.O. Box 1439, San Antonio, Texas 78205.

The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing. The Confirmation Hearing may be continued from time to time until the asset sale closing(s) actually occur. At the Confirmation Hearing, the Bankruptcy Court will (i) determine whether the requisite votes have been obtained for each of the Voting Classes, (ii) hear and determine objections, if any, to the Plan and to confirmation of the Plan that have not been previously disposed of, (iii) determine whether the Plan meets the confirmation requirements of the Bankruptcy Code, and (iv) determine whether to confirm the Plan.

Any objection to confirmation of the Plan must be made in writing and must specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim held by the objector. Any such objections must be filed and served upon the Persons designated in the notice of the Confirmation Hearing, in the manner and by the deadline described therein.

D.  **Recommendation of Debtor**

The Debtor recommends that holders of Claims entitled to vote on the Plan vote to **ACCEPT** the Plan.

## II.  CERTAIN EVENTS PRECEDING THE DEBTOR'S CHAPTER 11 FILING

A.  **Business, Corporate and Financial Overview**

CryptoMetrics, Inc. ("CryptoMetrics" or the "Debtor") is a biometric security company with offices currently in San Antonio, Texas. The Debtor previously had offices in Tuckahoe, New York. The Debtor is a holding company that owns one-hundred percent of the voting stock in two operating subsidiaries – (i) NextGenID, Inc. ("NextGen"), a Delaware Corporation, and (ii) CryptoMetrics Canada Incorporated ("CCI"), a corporation incorporated under Canadian law. From 2002 through 2008, the Debtor raised more than $60,000,000 in equity and debt from investors. Numerous rounds of financing occurred and the Debtor, based on available records, has approximately 400 shareholders located around the world. The Debtor is not publicly traded on any stock exchanges.

Prior to the involvement of current management, significant sums of money were paid out to agents and others persons around the world that appear at least to have been wasted funds and perhaps subsidized illegal activities. These payments are the subject of criminal investigations of the Debtor and certain individuals by the US Department of Justice, the FBI and the Royal Canadian Mounted Police. By November 2009, the Debtor had no cash, had

significant debt and had very little to no revenue. Given the precarious financial condition of the Debtor, the pending investigations, and pursuant to an order of the Delaware Chancery Court, the Debtor held a special shareholders meeting on November 30, 2009. To the best of the Debtor's knowledge this was the first shareholder meeting held even though the Debtor had been conducting business for many years. At the November shareholders meeting, Thomas O'Neill, Michael Vitale and Danny Mills were elected as Directors of the Debtor (the "Board"). Mr. O'Neill was subsequently appointed as Chairman and Treasurer, Mr. Vitale as Secretary, and Mr. Mills as President of the Debtor. These individuals continue to serve as members of the Board and as officers of the Debtor. John-Peter Bradford, a consultant to the Debtor's Canadian subsidiary, was originally appointed as a Director at a Board meeting that immediately followed the shareholders' meeting, however, he resigned at the end of February due to health reasons. The Board has requested that Mr. Bradford resume his duties as a Director and rejoin the Board and act as its chief restructuring advisor. On September 16, 2010, at a special meeting of the Board, Mr. Bradford was reappointed to the Board of Directors.

Since November 30, 2009, the officers and directors of the Debtor have undertaken the task of exploring alternatives for reorganizing, restructuring and recapitalizing of the Debtor. The Board has been actively engaged in investigating issues related to the apparent failure and insolvency of the Debtor. During this time, the Debtor had been pursuing all aspects of an out-of-court restructuring process, including attempts to bring short-term capital into the Debtor to allow for time to initiate a financial and operational restructuring. The Board's work revealed that the Debtor has significant outstanding debt, no material operations, and several large pending and threatened litigation claims. There are also the pending investigations discussed above by the US Department of Justice, the FBI and the Royal Canadian Mounted Police related to possible violations of the Foreign Corrupt Practices Act. These investigations have cast a cloud over the Debtor.

Concurrently with the Board's investigations, management has been actively trying to stabilize the business of the Debtor's operating subsidiaries -- NextGen and CCI -- with a view to making the Debtor viable. Management has concluded that the Debtor's operating subsidiaries have the potential to be successful if (i) their debts and the Debtor's debts can be restructured, (ii) the ongoing criminal investigations can be resolved, and (iii) the employees can be assured ongoing and uninterrupted payment of wages and benefits, which means, among other things, acquiring sufficient working capital to ensure the solvency of the operating subsidiaries, and fund their operations for the near term.

In January 2009, the Debtor, under its prior management, entered into a loan agreement with MBRO Capital, LLC (the "MBRO Loan") whereby the Debtor borrowed $2,000,000 from MBRO secured by the entirety of the assets of the Debtor, as well as the personal guarantees of the two founders and co-CEOs. These personal guarantees were secured by the guarantors' respective stock in the Debtor. The MBRO Loan was intended to be a short term loan with the intention that it be repaid in less than 90 days. However, after one extension, the note went into default and remains in default today. MBRO filed suit against the former CEO, the Debtor's then legal counsel and others claiming, among other things, fraud and misrepresentation by the Debtor and the CEO. MBRO was prepared to foreclose on its collateral which secured the note in January of 2010. In an effort to avoid the foreclosure, Security Concepts Group, LLC

("SCG") purchased substantially all of the Debtor's secured debt. SCG is an entity owned by certain shareholders, officers and directors of the Debtor. Tom O'Neill, who is Chairman and Treasurer of CryptoMetrics, as well as a shareholder of CrytpoMetrics, is also a manager of SCG and owns approximately 5% of SCG. Danny Mills, who is President of CryptoMetrics, is also a manager of SCG and owns approximately 8% of SCG.

SCG purchased substantially all of MBRO's interest in the MBRO Loan. SCG also purchased the seller's note made by the Debtor to BioAccess Holdings, LLC in connection with the Debtor's acquisition of Nextgen (the "NextgenID Loan"). As of the Petition Date, the outstanding balance of the MBRO Loan including unpaid interest and fees is approximately $3,423,170 and the outstanding balance of the NextgenID Loan including unpaid interest and fees is approximately $3,481,364. Both loans continue to be in default and are collateralized by the assets of the Debtor and Nextgen, respectively and, as such, represent the primary secured debt of the Debtor. Among other things, the acquisition of the MBRO Loan by SCG averted imminent foreclosure and allowed the Debtor time to pursue other strategies.

SCG has also loaned funds directly to the operating subsidiaries and to the Debtor. Those funds have been used to pay expenses, salaries, consulting fees, travel expenses and the vendor payables of the subsidiaries necessary to maintain current workflow, as well as Debtor legal and consulting fees and other miscellaneous corporate expenses. . SCG has continued to fund the day-to-day operating expenses for the operating subsidiaries, CCI and Nextgen, on a month-by-month basis, allowing the Debtor the time to seek viable alternatives to bankruptcy. An amount of $500,000 was loaned by SCG to CCI on an unsecured basis; in addition, approximately $3,600,000 was loaned by SCG to Nextgen and CCI on a secured basis, with a guarantee provided by the Debtor. CCI's assets and the Debtor's assets were pledged as security for this loan and guarantee, respectively. In total, since March 2010, SCG has funded approximately $3,600,000 directly to the Debtor's operating subsidiaries in an effort to stabilize their businesses. With the exception of the initial $500,000 loan to CCI, all funds loaned by SCG are secured by the assets and stock of the subsidiaries and guaranteed on a secured basis by the Debtor. SCG's security interests are secondary in priority to the security interests granted by the Debtor in connection with the MBRO and Nextgen loans.

### B. Other Debtor Related Matters

#### 1. *CryptoMetrics Canada, Inc. ("CCI")*

On March 29, 2010, CCI filed with the Canadian bankruptcy court for a "Proposal" under the Bankruptcy and Insolvency Act ("BIA") in Canada. This began a process which allowed CCI a time to negotiate settlements with its unsecured creditors while maintaining control of its operations. CCI retained a Trustee to oversee the process and sent required notices to all known creditors. The total CCI debt subject to the proposal process exceeded $4,200,000 (including past wages due to employees).

On June 11, 2010, CCI filed its Proposal and a meeting of creditors was held on June 30, 2010. At that meeting, CCI's creditors approved the Proposal which allows CCI to settle the obligations covered by the Proposal for approximately ten cents on the dollar. The Canadian

Bankruptcy Court approved the Proposal in early August 2010 and CCI is now operating with relief obtained from the completion of the Proposal process.

As a part of the BIA Proposal process, efforts were made to retain control of and protect the intellectual property ("IP") and know-how associated with CCI. As such, based on the advice of Canadian counsel, NextgenID-Canada, Inc. ("Nextgen-Canada") was formed as a wholly owned subsidiary of Nextgen. Nextgen-Canada entered into a license agreement with CCI under which Nextgen-Canada licenses all technology necessary for the go forward operations from CCI. Payments under the license agreement from Nextgen-Canada to CCI will fund the payments to CCI's creditors covered by the Proposal. It is important to note that no IP or other assets have been transferred out of CCI. Rather these assets are serving as collateral for the loans SCG and Nextgen have made and intend to make to CCI in order to keep CCI's operations going. If those loans are not repaid, SCG and Nextgen will have the right to foreclose on the collateral.

At this time there is no intention of having to utilize NextgenID-Canada as the go-forward entity, as CCI has resolved most of its issues with creditors through completion of the Proposal process. Accordingly, NextgenID-Canada will remain as a shell company for the foreseeable future.

### 2. *United Arab Emirates*

Prior management focused almost all of their efforts on obtaining a contract to supply the Debtor's technology to the United Arab Emirates. Prior management claimed that they had secured a contract worth "hundreds of millions" of dollars with the UAE Ministry of Interior ("MOI"). The existence of this "contract" was used as the basis for raising significant amounts of capital and for a failed reverse merger by the Debtor with a public shell company in 2008.

As it turns out, there are significant issues with this contract, and CryptoMetrics' business efforts in the UAE. Chief among these is the DoJ investigation into alleged violations of the Foreign Corrupt Practices Act. Additionally, the contract which was to generate the UAE business was negotiated and entered into by Robert Barra ("Barra") and Joel Shaw ("Shaw"), both former management of the Debtor, through BioDentity Systems LLC ("BioDentity") of the UAE, and is very one sided in favor of the MOI. The contract has a 25-year term and provides the MOI the right to use Debtor's technology. However, the MOI is not locked in by this contract and is free to use technology supplied by others, at their sole discretion. Moreover, whether or not the MOI exercised its right to purchase competing technology, the contract prohibits the Debtor from selling its technology anywhere in the Middle East North Africa ("MENA") region except through BioDentity. BioDentity was incorporated in Abu Dhabi at the direction of Barra and Shaw to be ultimately owned 51% by UAE interests and 49% by the Debtor's shareholders. While the record is not entirely clear, upon information and belief, CryptoMetrics' shareholders' interest is now held 80% by Barra and 20% by Shaw. Thus, whatever benefits were to flow from the UAE business to the Debtor were structured so they would be controlled by Barra and Shaw, not by the Debtor.

It is now believed that the MOI has no intention of moving forward with the Debtor's technology and is focused on obtaining repayment of a $5,000,000 unsecured loan it made to the Debtor in May 2008. The current management of the Debtor has been negotiating with representatives of the MOI with the following objectives in mind:

- Termination of the existing agreement, and other related agreements, thus freeing the Debtor of its restrictive provisions; and

- Allowing the MOI to sell the $5,000,000 loan to a third party which would permit the MOI to recoup the amount of its loan, but conditioning such sale on the buyer agreeing to extend the term of the loan for an additional 18 months.

This proposal has been pending before the MOI's representatives for over five months and still has not been accepted or approved by them. Although not yet confirmed, upon information and belief, prior CryptoMetrics management (Barra, Shaw and others) and certain other shareholders are taking steps in the UAE which are interfering with the conclusion of these negotiations. The $5,000,000 debt to the MOI, which is now due at any time on demand, was a significant factor in the decision to file for bankruptcy protection. The Debtor believes that it may have avoidance claims against the MOI related to the incurrence of the $5,000,000 debt to the MOI and expressly reserves the right to assert these claims on behalf of its estate.

**C.     Litigation Against the Debtor**

The Debtor is a defendant in three lawsuits, one by the past CFO seeking $3,000,000 in damages, one by an agent from the UAE seeking $25,000,000 in damages, and the third by one of the several law firms not paid by prior management. The lawsuits are problematic in that the Debtor does not have the time and money to respond to them, and the Debtor would be unable to satisfy any significant judgment in any one of these suits, should the plaintiffs prevail on their claims. In addition to these three lawsuits, other litigation may be brought by other creditors, including the MOI seeking repayment of its $5,000,000 unsecured loan as noted above.

**D.     Decision to File Chapter 11**

In summary, the Debtor has been facing significant challenges. The principal challenge facing the Debtor continues to be its need to raise additional funds, and the method by which that might be done. The Debtor has pursued alternatives to bankruptcy for the past 10 months but has been unsuccessful on all accounts. Potential investors contacted by the Debtor during the several months leading up to the bankruptcy filing have made it clear that they will not invest in the Debtor unless the Debtor can cleanse itself of many (if not all) of the claims and contingencies it faces. Having taken all available steps to avoid bankruptcy, the Board determined that bankruptcy is the only viable alternative, and, as such, directed the Debtor to initiate a chapter 11 bankruptcy proceeding in San Antonio, Texas.

**E.     Proposed Sale**

The Debtor has determined that the only way to bring value to the stakeholders of the Debtor is to sell the Assets of the Debtor. SCG has offered to buy the subsidiaries (Nextgen and

CCI), along with any related intellectual property of the Debtor, for the value of its secured claims against the Debtor (approximately $10.5 million) plus a cash payment in the amount of $150,000. An "Asset Purchase Agreement" has been executed by SCG. Moreover, the Debtor has been actively seeking other viable purchasers of the subsidiaries and the Debtor is seeking Court approval for an auction in November, 2010. The Debtor believes that this auction and sale process provides the greatest opportunity to maximize value for stakeholders.

It is important to note that SCG could have sought to foreclose its liens on the Debtor's Assets for the value of its claims. However, SCG instructed the Debtor that it would prefer to purchase the subsidiaries out of bankruptcy in an effort to maximize value to the stakeholders of the Debtor. This alternative was viewed as very beneficial by the Board of the Debtor since a foreclosure would likely have yielded no value to stakeholders. Moreover, the Debtor requested that SCG provide a cash component to its bid and, in response to the Debtor's request, SCG agreed to bid its claims plus $150,000 in cash. In consideration for the credit bid of SCG's secured claims and the cash payment from SCG to the Debtor, the Debtor proposes to release any and all claims against SCG as part of this transaction. The cash portion of SCG's bid is viewed as extremely valuable to the Debtor since the Debtor does not have any other available cash with which it could fund litigation and pursue various claims for the benefit of its stakeholders.

### F. Claims of the Debtor

The Debtor believes that there are certain claims that exist against various parties, including former management. The Debtor's Plan proposes to preserve those claims for stakeholders. Moreover, it is anticipated that the $150,000 in cash provided by SCG (or more if there are overbids) will be used to help fund such litigation for the benefit of the Debtor's stakeholders.

### G. Liquidating Plan

The Plan proposes to sell the majority of the Debtor's Assets to the highest bidder and reorganize the Debtor as a "Liquidating Debtor." Post-Effective Date, the Debtor's equity interests will be cancelled and new equity interests in the Liquidating Debtor will be issued to the Plan Agent. The Plan Agent is charged with (i) pursuing any other remaining assets of the Debtor such as legal actions and claims (as described above), (ii) monetizing such assets, legal actions and claims for the benefit of stakeholders, (iii) making distributions in accordance with the Plan, and (iv) winding-down the Liquidating Debtor upon completion of the case. The Debtor will disclose the identity of the Plan Agent within 10 days prior to the Confirmation Hearing.

### III. EVENTS DURING THE CHAPTER 11 CASES

### A. Continuation of Business

On the Petition Date, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Petition"). Subsequent to the Petition Date, the Debtor has continued to operate as debtor-in-possession subject to the supervisions of the Bankruptcy Court.

## B. Retention of Okin Adams & Kilmer LLP as Bankruptcy Counsel

The Debtor first contacted Okin Adams & Kilmer LLP ("OAK") on or about July 27, 2010 in order to seek advice with regard to representing the Debtor in its chapter 11 case. OAK was retained by the Debtor on August 9, 2010. On September 17, 2010 OAK filed an Application for Order Pursuant to Section 327(a) of the Bankruptcy Code Authorizing its Employment and Retention as Bankruptcy Counsel to the Debtor. On _____, 2010, the Court entered an Order Authorizing the Retention and Employment of Okin Adams & Kilmer LLP as Bankruptcy Counsel to the Debtors *nunc pro tunc* as of September 17, 2010.

## C. DIP Loan Provided by SCG

On September 17, 2010, the Debtor filed a Motion Under 11 U.S.C. §§ 105(a), 361, 164 and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtor to Incur Post-Petition Secured Indebtedness and (II) Approving Use of Cash Collateral (the "DIP Motion"), seeking the Court's authorization to borrow up to $150,000 in postpetition debtor-in-possession financing from SCG as well as authority to use cash collateral. On _____, 2010, the Court entered a Final Order Under 11 U.S.C. §§ 105(a), 361, 363 and 364 and Fed. R. Bankr. P. 2002, 4001 and 9014 (I) Authorizing Debtor to Incur Post-Petition Indebtedness and (II) Approving Cash Collateral.

## D. Sale and Marketing Process

On September 17, 2010, the Debtor filed a Motion for an Order (I) Approving Form of Stalking Horse APA, (II) Approving Bidding Procedures for an Auction of Debtor's Assets, (III) Scheduling a Date for the Auction, (IV) Approving the Form of Proposed Notice of Auction and Sale Hearing, and (V) Setting Certain Dates Related to the Sale of the Debtor's Assets (the "Bid Procedures Motion"). In addition, the Debtor filed a stand-alone Motion for an Order Pursuant to Section 363 of the Bankruptcy Code (I) Authorizing the Sale of Substantially all of Certain Debtor's Assets Free and Clear of Liens, Claims, Encumbrances, and Interests and (II) Approving Asset Purchase Agreement (the "Sale Motion"). The Court entered an Order Approving the Bid Procedures Motion and the Sale Motion on _____ __, 2010.

## IV. SUMMARY OF THE PLAN

## A. Introduction

Set forth in this Section is a description of the basic terms of the Plan. This description is not intended, nor should it be relied upon, as a substitute for a careful review of the actual terms of the Plan, a complete copy of which is attached hereto as Exhibit A.

## B. Sale Alternative Confirmation

The Debtor has chosen to move forward with the Sale Alternative. The "Sale Alternative" shall mean a Plan that provides for the waterfall distribution of the Sale Proceeds, as reflected therein. Accordingly, the Debtor reserves its right to take any necessary actions, included but not limited to, the filing of a motion with the Bankruptcy Court seeking to pay in

full Secured Claims attaching to such property immediately after the closing of the sale without the necessity of confirmation of the Plan or the conclusion of any other pending or proposed sales of the Debtor's assets. The Debtor reserves this right with respect to any and all sales of the Debtor's property, whether or not such sales occur prior to or after the Confirmation Hearing.

### a. Stalking Horse Bidder for Sale Alternative Confirmation.

On September 17, 2010, the Debtor executed an Asset Purchase Agreement with Security Concepts Group, LLC (the "Stalking Horse APA") under which the Debtor would sell the Shares (as defined in the Stalking Horse APA) and assign its right, title and interest in certain Patents (as defined in the Stalking Horse APA, and together with the Shares, the "Assets") to SCG (the "Stalking Horse Bidder") for an amount equal to the value of the SCG Credit Bid, plus $150,000 (the "Stalking Horse Purchase Price"), subject to the proposed bidding procedures (the "Bidding Procedures") and the Bankruptcy Court's approval of the following:

*The Stalking Horse APA*:

    a.   <u>General Terms</u>. The Stalking Horse Bidder would acquire the Assets.

    b.   <u>Bankruptcy Court Approval</u>. The sale of the Assets would be subject to approval by the Bankruptcy Court and competitive bidding pursuant to the Bidding Procedures.

    d.   <u>Purchase Price</u>. The Purchase Price to be paid by the Stalking Horse Bidder for the Assets would be the Stalking Horse Purchase Price.

*Auction Process:*

The Stalking Horse Bidder's acquisition of the Debtor's Assets was subject to a bidding procedure and auction. The auction was held on _____, 2010 at the offices of OKIN ADAMS & KILMER LLP.

After several rounds of bidding, the Debtor selected the Stalking Horse Bidder as having provided the highest and best bid with a bid of $_____.

On _____, 2010, a hearing was held to approve the selection of the Stalking Horse Bidder as the winner of the auction and to approve the sale of the Debtor's assets. After the hearing, the Court entered an Order (A) Authorizing the Sale of Substantially All of Certain Debtor's Assets; and (B) Approving the Asset Purchase Agreement (the "Sale Order") [Docket No.___].

### C. Classification of Claims

Section 1122 of the Bankruptcy Code provides that, except for certain claims classified for administrative convenience, a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class. The Bankruptcy Code also requires that a plan provide the same treatment for each claim of a particular class unless the holder of a particular claim agrees to a less favorable treatment of its

claim. The Debtor believes that the Plan complies with this standard. The Plan divides Claims against and Equity Interests in the Debtors into the following Classes:

Class 1 – DIP Lender Claims

Class 2 – SCG Secured Claims

Class 3 – Other Secured Claims

Class 4 – Priority Claims

Class 5 – General Unsecured Claims

Class 6 – Subordinated Claims

Class 7 – Equity Interests

For a description of the treatment of the Claims and Equity Interests and a summary of distributions under the Plan, *see* Section IV.D, "Treatment of Claims and Equity Interests and Summary of Distributions under the Plan."

A Claim or Equity Interest is classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and is classified in other Classes to the extent that any remainder of the Claim or Equity Interest qualifies within the description of such other Classes. A Claim or Equity Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Equity Interest is a Claim or Equity Interest in that Class and has not been paid in full, released or otherwise satisfied prior to the Effective Date.

**D.     Treatment of Claims and Equity Interests and Summary of Distributions Under the Plan**

Under the Plan, Claims against and Equity Interests in the Debtor are divided into different Classes. Only Allowed Claims and Allowed Equity Interests are entitled to receive distributions under the Plan. The following is a description of the Plan's treatment of Claims against and Equity Interests in the Debtors. Administrative Expense Claims and Priority Tax Claims are not classified under the Plan.

**1.     Administrative Expense Claims**

**a.     Allowed Administrative Expense Claims**

Subject to the provisions contained in Section 2.2 of the Plan, unless otherwise agreed in writing by the Plan Agent and the holder of an Allowed Administrative Expense Claim, the Plan Agent shall pay to each holder of an Allowed Administrative Expense Claim an amount equal to its Allowed Administrative Expense Claim on the latest of (a) the Effective Date or as soon thereafter as is practicable, (b) 30 days after the date on which such Administrative Expense Claim becomes an Allowed Administrative Expense Claim by the entry of a Final Order, and

-12-

(c) the date the Plan Agent is otherwise obligated to pay such Administrative Expense Claim in accordance with the terms and provisions of the particular transactions giving rise to such Claim, the terms and provisions of the Plan and any orders of the Bankruptcy Court relating thereto.

### b.      Requests for Allowance of Administrative Expense Claims

Except as expressly set forth to the contrary in the Plan, each Person, including each Professional, shall file an application for an allowance of an Administrative Expense Claim in conformity with the following:

(1)      **Professionals**.      All Professionals shall file a final application for the allowance of a Fee Claim on or before forty-five (45) days following the Effective Date.  Objections to any Fee Claim must be filed and served on the Liquidating Debtor, the Plan Agent and the requesting Professional no later than twenty (20) days after the filing of the applicable request for payment of the Fee Claim.

(2)      **Other Administrative Expense Claimants**.  All holders of Administrative Expense Claims other than Professionals and holders of ordinary course trade payable shall file an application for the allowance of an Administrative Expense Claim with the Bankruptcy Court on or before thirty (30) days following the Effective Date.  Holders of Administrative Expense Claims, including such Persons asserting a Claim under § 503(b)(9) of the Bankruptcy Code, who do not file a request by such deadline shall be forever barred from asserting such Claims against the Debtor, the Liquidating Debtor or their respective property and assets (whether cash or otherwise).

### 2.      Priority Tax Claims

### a.      Schedule of Payments

Each holder of an Allowed Priority Tax Claim shall be paid in full, in Cash, as soon as practicable following the later of (a) the Effective Date, (b) the date on which such Claim becomes an Allowed Claim, and (c) such other date as agreed by such holder and the Plan Agent.

### b.      Other Provisions Concerning Treatment of Priority Tax Claims

Notwithstanding the provisions of Section 2.3 of the Plan, the holder of an Allowed Priority Tax Claim will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim, except as Allowed under § 507(a)(8)(G) of the Bankruptcy Code.  Other than as Allowed under § 507(a)(8)(G) of the Bankruptcy Code, any such Claim or demand for any such penalty (i) will be subject to treatment in Class 6 pursuant to § 726(a)(4) of the Bankruptcy Code and (ii) the holder of an Allowed Priority Tax Claim will not assess or attempt to collect such penalty from the Debtor, the Liquidating Debtor or their property.

### 3.   Summary of Classification and Treatment of Holders of Allowed Claims and Equity Interests that are Placed in Classes

The following table sets forth a brief summary of the classification and treatment of Claims and Equity Interests and the estimated distributions to the holders of Allowed Claims that are placed in Classes under the Plan. The information set forth in the tables is for convenience of reference only. Each holder of a Claim or Equity Interest should refer to Article V of the Plan, "Treatment of Claims and Equity Interests," for a full understanding of the classification and treatment of Claims and Equity Interests provided under the Plan. The estimates set forth in the table may differ from actual distributions due to, among other things, variations in the amount of Allowed Claims, the existence and resolution of Disputed Claims and certain risk factors potentially impacting recoveries under the Plan, including those described in Section VIII below. Unless otherwise noted, these estimates are as of _____, 2010.

| *Class Description* | *Treatment Under the Plan* |
|---|---|
| Administrative Claims<br><br>Estimated Amount: $_____ | *Unimpaired.* |
| Priority Tax Claims<br><br>Estimated Amount: $_____<br><br>(the Debtor anticipates that Priority Tax Claims will be significantly reduced by amendments to claims, schedules, and claim objections). | *Unimpaired.* |
| Class 1 – DIP Lender Claims<br><br>Estimated Amount: $_____ plus interest | *Unimpaired.*<br><br>The holder of the Allowed DIP Lender Claims shall be paid in Cash in full by the Plan Agent from the Sale Proceeds on or as soon as practicable following the Effective Date, unless the DIP Lender successfully credit bids at the Auction or unless otherwise agreed by the holder. The DIP Lender may credit bid its DIP Lender Claims at the Auction. If the DIP Lender is the Successful Bidder at the Auction, the DIP Lender Claims will be extinguished and credited toward the final purchase price. |

| | |
|---|---|
| Class 2 – SCG Secured Claims<br><br>Estimated Amount: $_____plus attorneys' fees the approximate amount of $_____ (as of _____, 2010 and subject to Section 506(b)) | *Impaired.*<br><br>On or as soon as practicable following the Effective Date or as provided in the Sale Order, Plan Agent shall pay to the holders of the Allowed SCG Secured Claim the lesser of the following amounts: (a) one hundred percent (100%) of the Sale Proceeds attributable to the SCG Collateral, subject to the rights of any senior Lien holders, or (b) Cash in the full amount of the Allowed SCG Secured Claim. Any SCG Deficiency Claim shall receive treatment in Class 5 of the Plan. However, to the extent the holder of the SCG Secured Claims is the Successful Bidder at the Auction, the SCG Secured Claims will be extinguished and credited toward the final purchase price. |
| Class 3 – Other Secured Claims<br><br>Estimated Amount: $_____ | *Impaired.*<br><br>On or as soon as practicable following the later of (i) the Effective Date, and (ii) the date such Claim becomes an Allowed Claim, the Plan Agent shall pay to each holder of an Allowed Other Secured Claim the lesser of the following amounts: (a) one hundred percent (100%) of the Sale Proceeds attributable to the Collateral securing such Allowed Other Secured Claim, subject to the rights of any senior Lien holders, and (b) Cash in the full amount of such Claim. Any Deficiency Claims shall receive treatment in Class 5 of the Plan. |
| Class 4 – Priority Claims<br><br>Estimated Amount: $_____ | *Unimpaired.*<br><br>Holders shall be paid in Cash in full by the Plan Agent on or as soon as practicable following the later of (a) the Effective Date, and (b) the date on which such Claim becomes an Allowed Claim. |

| Class 5 – General Unsecured Claims | *Impaired.* |
|---|---|
| Estimated Amount: $_____<br><br>(Estimated amounts may be further reduced by claim objections and amendments to the schedules.) | Each holder of an Allowed General Unsecured Claim shall receive its Pro Rata share, up to the Allowed Amount of such Claimant's Allowed Claim, of Liquidating Debtor Assets, as applicable, remaining following (i) full payment of, or full reservation for, Allowed Administrative Claims, Allowed Priority Claims, Allowed DIP Lender Claims, Allowed SCG Claims, Allowed Other Secured Claims and Allowed Priority Tax Claims, each to the extent payable from the Debtor's Estate, as applicable, pursuant to the Plan, and (ii) funding of the Plan Administration Reserve. As soon as practicable following (i) and (ii) above, the Plan Agent shall make an initial Pro Rata Distribution in accordance with Class 5, in an amount determined in the reasonable discretion of the Plan Agent. The Plan Agent shall make subsequent Pro Rata Distributions in accordance with this Class 5 at such times and in such amounts as determined in the reasonable discretion of the Plan Agent. |

| Class 6 – Subordinated Claims | *Impaired.* |
|---|---|
| Estimated Amount: $_____ | Each holder of an Allowed General Unsecured Claim shall receive its Pro Rata share, up to the Allowed Amount of such Claimant's Allowed Claim, of Liquidating Debtor Assets, as applicable, remaining following (i) full payment of, or full reservation for, Allowed Administrative Claims, Allowed Priority Claims, Allowed DIP Lender Claims, Allowed SCG Claims, Allowed Other Secured Claims, Allowed Priority Tax Claims and Allowed General Unsecured Claims, each to the extent payable from the Debtor's Estate, as applicable, pursuant to the Plan, and (ii) funding of the Plan Administration Reserve. As soon as practicable following (i) and (ii) above, the Plan Agent shall make an initial Pro Rata Distribution in accordance with Class 6, in an amount determined in the reasonable discretion of the Plan Agent. The Plan Agent shall make subsequent Pro Rata Distributions in accordance with Class 6 at such times and in such amounts as determined in the reasonable discretion of the Plan Agent. |
| Class 7 – Equity Interests | *Impaired.* |
| | All Equity Interests shall be canceled as of the Effective Date. Each holder of an Allowed Equity Interest shall retain a residual interest in the Liquidating Debtor Assets in the event that all Allowed Claims are paid in full pursuant to this Plan. |

Holders of Claims and Equity Interests in Classes 2, 3, 5, 6 and 7 are Impaired by the Plan. Under § 1126(f) of the Bankruptcy Code, holders of Claims in Class 1 and Class 4 are conclusively deemed to have accepted the Plan, and the votes of such holders will not be solicited.

### E.    Distribution Provisions

#### 1.    Distributions

All Distributions under the Plan shall be made by the Plan Agent pursuant to the terms and conditions contained in the Plan; *provided, however*, that no Distribution shall be made on behalf of any Claim which may be subject to disallowance under § 502(d) of the Bankruptcy Code.

#### 2.    Distributions of Cash

All Distributions of Cash to be made by the Plan Agent pursuant to the Plan shall be made by a check or wire transfer from the Plan Agent's account (including Liquidating Debtor accounts under the control of the Plan Agent) maintained in accordance with the Plan.

#### 3.    Distributions on a Subsequent Distribution Date

Pursuant to the provisions set forth in the Plan, to the extent that cash or other assets are available subsequent to the Initial Distribution Date, the Plan Agent shall, on a subsequent date (a "Subsequent Distribution Date"), distribute such Cash or other assets to the holders of Claims entitled to Distributions under the Plan that were Allowed on the Effective Date or subsequently have become Allowed Claims on or before the Subsequent Distribution Date in accordance with the schedules, treatment and priority of Claims established by the Plan.

#### 4.    Distributions on the Final Distribution Date

Pursuant to the provisions set forth in the Plan, to the extent that cash or other assets are available subsequent to the Initial Distribution Date, any Subsequent Distribution Date and after the liquidation of any and all assets to be distributed under the Plan, the Plan Agent shall establish a final distribution date (the "Final Distribution Date") upon which the Plan Agent shall distribute such Cash or other assets to the holders of Claims entitled to Distributions under the Plan that were Allowed on the Effective Date or subsequently have become Allowed Claims on or before the Final Distribution Date in accordance with the treatment and priority of Claims established by the Plan.

#### 5.    Delivery of Distributions and Undeliverable Distributions

Distributions to the holder of an Allowed Claim shall be made at the address of such holder as set forth on the Schedules unless superseded by the address as set forth on the Proof of Claim filed by such holder or by a written notice to the Plan Agent providing actual knowledge to the Plan Agent of a change of address.  If any holder's Distribution is returned as undeliverable, no further Distributions to such holder shall be made unless and until the Plan Agent is notified in writing within six months of the Distribution date of such holder's then current address, at which time all Distributions shall be made to such holder, without interest. All Claims for undeliverable Distributions shall be made within six months after the date such undeliverable Distribution was initially made.  If any Claim for an undeliverable Distribution is not timely made as provided herein, such Claim shall be forever barred with prejudice.  After such date, all unclaimed property shall be applied first to satisfy the costs of administering and

fully consummating the Plan, then for Distribution in accordance with the Plan, and the holder of any such Claim shall not be entitled to any other or further Distribution under the Plan on account of such undeliverable Distribution or such Claim.

### 6. Time Bar to Cash Payments and Disallowances

Checks issued by the Plan Agent in respect of Allowed Clams shall be void if not negotiated within six months after the date of issuance thereof. Requests for reissuance of any check shall be made to the Plan Agent by the holder of the Allowed Claim to whom such check originally was issued, on or before the expiration of six months following the date of issuance of such check. After such date, (a) all funds held on account of such void check shall be applied first to satisfy the costs of administering and fully consummating the Plan, then for Distribution in accordance with the Plan, (b) the Claim of the holder of any such void check shall be disallowed, and (c) such Claimant shall not be entitled to any other or further Distribution on account of such Claim.

### 7. Minimum Distributions

If a Distribution to be made to a holder of an Allowed Claim on any Distribution Date, excluding the Final Distribution Date, would be $100.00 or less, notwithstanding any contrary provision of the Plan, no Distribution will be made to such Claimant.

### 8. Transactions on Business Days

If the Effective Date or any other date on which a transaction, event or act may occur or arise under the Plan shall occur on Saturday, Sunday or other day that is not a Business Day, the transaction, event or act contemplated by the Plan to occur on such day shall instead occur on the next day which is a Business Day.

### 9. Distributions After Allowance

Distributions to each holder of a Disputed Claim, to the extent that such Claim ultimately becomes Allowed, shall be made in accordance with the provisions of the Plan governing the Class of Claims to which such holder belongs.

### 10. Disputed Payments

If any dispute arises as to the identity of a holder of an Allowed Claim who is to receive any Distribution, the Plan Agent may, in lieu of making such Distribution to such Person, make such Distribution into an escrow account until the disposition thereof shall be determined by the Bankruptcy Court or by written agreement among the interested parties to such dispute.

### 11. No Distribution in Excess of Allowed Amount of Claim

Notwithstanding anything to the contrary herein, no holder of an Allowed Claim shall receive in respect of such Claim any Distribution in excess of the Allowed amount of such Claim.

F.     **Means for Execution of the Plan**

1.     **Cancellation of Equity Interests and Re-Issuance of New Common Stock**.

On the Effective Date all of the then existing Equity Interests in the Debtor shall be canceled, and the Liquidating Debtor shall authorize and issue 1,000 shares of its common stock, $1.00 par value (the "New Common Stock") to the Plan Agent.  The Plan Agent shall be the record owner of the New Common Stock of the Liquidating Debtor, which shall constitute 100% of the issued and outstanding shares of capital stock in the Liquidating Debtor.  The Plan Agent shall hold the New Common Stock for the benefit of the holders of Allowed Claims and Allowed Equity Interests against the Debtor.  The Plan Agent shall vote such shares at all appropriate times to elect the Plan Agent as the sole director and officer of the Liquidating Debtor and otherwise to implement the terms and provisions of the Plan.

2.     **Dissolution of Corporate Entities**.

The Liquidating Debtor shall be dissolved and its corporate existence terminated, without further corporate action, upon the final decree closing this Case become a Final Order, unless the Case is later re-opened or is deemed reinstated for the purpose of effectuating the Plan.  The Confirmation Order shall be deemed the appropriate authorization, to the extent required under state law, authorizing the Plan Agent to file a certificate of dissolution upon entry of a final decree in the Case.

3.     **Vesting of Property of the Estate in the Liquidating Debtor**.

On the Effective Date, (i) the Liquidating Debtor Assets shall vest in the Liquidating Debtor, free and clear of any liens, claims and encumbrances, except as otherwise provided in the Plan.

4.     **Plan Agent**

a.     **Identity From and After the Effective Date.**

_____, or another person to be designated by the Debtor and approved by the Bankruptcy Court at the Confirmation Hearing, shall serve as the Plan Agent pursuant to the Plan, until death, resignation or discharge or the appointment of a successor Plan Agent in accordance with the Plan, at which point such successor Plan Agent shall be the Plan Agent.  The Plan Agent shall be the sole officer, director and shareholder of the Liquidating Debtor.

b.     **Responsibilities and Powers of the Plan Agent.**

In the exercise of its authority on behalf of the Debtor and Liquidating Debtor, the Plan Agent shall have, consistent with other provisions of the Plan, the following responsibilities and powers:

(i)  make all Distributions contemplated under the Plan;

(ii)  establish and maintain any reserves called for under the Plan, and such other reserves as determined to be prudent and/or necessary;

(iii)  enter into any agreement required by or consistent with the Plan and perform any obligations thereunder (including any Professionals retained by the Debtors during the Chapter 11 Cases);

(iv)  participate as a party-in-interest in any proceeding before the Bankruptcy Court, or other court of competent jurisdiction, involving the Debtor, the Liquidating Debtor or the Chapter 11 Case;

(v)  employ such professionals, agents or employees as deemed necessary to carry out the provisions of the Plan and pay reasonable compensation to such persons from assets of the Estate;

(vi)  carry out and enforce the provisions of the Plan and consummate the Plan;

(vii)  propose any amendment, modification or supplement to the Plan;

(viii)  exercise such other powers and duties as are necessary or appropriate in the Plan Agent's discretion to accomplish the purposes of the Plan;

(ix)  pursue any Rights of Action on behalf of the Debtor and Liquidating Debtor and compromise or settle any Rights of Action in a manner consistent with the Plan;

(x)  open and maintain bank accounts as necessary to effectuate the Plan, including accounts in the name of the Liquidating Debtor;

(xi)  carry insurance coverage, including fiduciary insurance, as is normal and customary and in such amounts as deemed advisable;

(xii)  maintain appropriate records and account books relating to the consummation of the Plan, including records of all Distributions made or contemplated under the Plan and all transactions undertaken by the Plan Agent, acting as Plan Agent; and

(xiii)  exercise such other powers and duties as are necessary or appropriate in the Plan Agent's discretion to accomplish the purposes of the Plan:

(xiv) management of and control over the Liquidating Debtor;

(xv) consistent with maintaining the value and liquidating the residual assets of the Liquidating Debtor, invest funds of the Estate consist with the guidelines established by the Office of the United States Trustee;

(xvi) sale or dispose of assets of the Liquidating Debtor, including abandon any assets of the Liquidating Debtor that are burdensome and of no benefit;

(xvii) act in the name of or in the place of the Debtor and/or Liquidating Debtor in any action before the Bankruptcy Court and/or any other judicial or administrative body;

(xviii) pay all taxes, make all tax withholdings and file all tax returns and tax information returns and make tax elections by and on behalf of the Liquidating Debtor;

(xix) pay all lawful expenses, debts, charges and liabilities of the Liquidating Debtor;

(xx) protect and defend any assets of the Liquidating Debtors;

(xxi) maintain the Debtor's and the Liquidating Debtor's records; and

(xxii) file dissolution documents with the appropriate governmental agencies to dissolve the Liquidating Debtor as applicable or necessary filing entry of a Final Decree.

### c. No Bankruptcy Court Approval.

Except as otherwise provided in the Plan, the Plan Agent may perform any of its responsibilities and exercise any of its powers, including its compromise and settlement powers without seeking or obtaining Bankruptcy Court approval.

### d. Compensation of Plan Agent and its Professionals.

In addition to reimbursement for the actual out-of-pocket expenses incurred, the Plan Agent and any employees or professionals engaged or retained by the Plan Agent, shall be entitled to reasonable compensation for services rendered. The compensation of the Plan Agent will be calculated on a per hour basis using the Plan Agent's standard and customary billing rates. The Plan Agent's professionals shall be entitled to reimbursement for out-of-pocket expenses incurred and reasonable compensation for services rendered on the same economic terms as is normal and customary for such professionals. The Plan Agent and all professionals employed by the Plan Agent shall be entitled to payment of their post-Effective Date fees and

expenses from the Liquidating Debtor on a monthly basis without further notice to or action or approval of the Bankruptcy Court.

### e. Resignation.

The Plan Agent may resign as Plan Agent under the Plan by an instrument in writing signed by the Plan Agent and filed with the Bankruptcy Court. Such resignation shall become effective ninety (90) days following the giving of such notice or upon the earlier appointment of a successor Plan Agent.

### f. Removal.

The Plan Agent (including any successor Plan Agent) may be removed at any time with or without cause by the Bankruptcy Court. Any party in interest may apply to the Bankruptcy Court for an order removing the Plan Agent for cause, with the determination of cause left to the reasonable discretion of the Bankruptcy Court.

### g. Appointment of Successor Plan Agent.

In the event of the death, resignation or removal (prospective or otherwise) of the Plan Agent, any party in interest, any professional for the Plan Agent, the Plan Agent and/or the United States Trustee may seek to designate a successor Plan Agent, and the Bankruptcy Court shall appoint a successor Plan Agent. Any successor Plan Agent appointed hereunder shall execute, acknowledge and deliver to the Bankruptcy Court and to the retiring Plan Agent an instrument duly accepting such appointment and agreeing to be bound by the terms of the Plan and thereupon such successor Plan Agent, without further act, deed or conveyance, shall become vested with all of the rights, powers, trusts and duties of the Plan Agent.

### 5. Plan Administration Reserve.

As soon as practicable following the Effective Date, the Plan Agent shall establish and fund from the Liquidating Debtor the Plan Administration Reserve account in an amount reasonably determined to be sufficient to adequately satisfy estimated costs, fees and expenses of the administration of (not including the satisfaction of Claims and Interests) of the Plan. The Plan Agent may from time to time, in its reasonable discretion, adjust the amount held in the Plan Administration Reserve. Notwithstanding the existence of the Plan Administration Reserve, the actual costs, fees and expenses of the administration of the Plan shall be payable by the Liquidating Debtor unless otherwise provided by the Plan.

### 6. Further Orders.

Upon motion by the Plan Agent, the Bankruptcy Court may enter such other and further orders as may be necessary or appropriate to facilitate the consummation of the Plan.

### 7. Post-Effective Date Reports, Final Decree.

The Plan Agent shall file and serve upon the United States Trustee periodic status reports in substantially the form provided by the United States Trustee from the Effective Date until

entry of a final decree, unless otherwise ordered by the Bankruptcy Court. After the Debtor's Estate is fully administered, the Plan Agent shall file an application for a final decree closing the Case, and shall serve the application together with a proposed final decree on the master service list.

### 8. Discharge of Plan Agent.

Upon the final decree closing the Case becoming a Final Order, the Plan Agent shall be discharged and released from all further duties arising from or relating to the Plan and the Liquidating Debtor. Upon entry of a final decree closing the Case, the Plan Agent and its professionals shall be released or discharged from all claims arising from their actions prior to entry of the final decree except for liability that results from bad faith, willful misconduct or gross negligence.

### 9. Corporate Action.

Each of the matters provided for under the Plan involving the corporate structure of the Debtor or corporate action to be taken by or required of the Debtor, shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized, approved and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by shareholders, creditors, officers or directors of any of the Debtor or the Liquidating Debtor.

### 10. Release of Liens.

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, on the Effective Date and concurrently with the applicable Distributions made pursuant to Article 7 of the Plan, all mortgages, deeds of trust, Liens or other security interests against the property of the Estate vesting in the Liquidating Debtor will be fully released and discharged, and all of the rights, title and interests of any holder of such mortgages, deeds of trust, Liens or other security interests, including any rights to any collateral thereunder, will revert to the Liquidating Debtor and its successors and assigns. As of the Effective Date, the Liquidating Debtor shall be authorized to file on behalf of creditors Form UCC-3s or other forms as may be necessary to implement the provisions of Section 6.10 of the Plan.

### 11. Exemption from Certain Transfer Taxes and Recording Fees

Pursuant to § 1146(a) of the Bankruptcy Code, any transfers from a Debtor to the Liquidating Debtor or to any other Person or entity pursuant to the Plan, or any agreement regarding the transfer of title to or ownership of any of the Debtors' real or personal property, will not be subject to any document recording tax, stamp tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording tax, or other similar tax or governmental assessment, and the Confirmation Order will direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

## 12.     Withholding and Reporting Requirements

In connection with the Plan, the Plan Agent on behalf of the Liquidating Debtor shall (a) comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority; (b) timely file all tax returns as required by law to be filed; (c) continue to engage accountants or such other professionals to prepare and file all tax returns as required by law to be filed; (d) take such other actions as are reasonably necessary, including the allocation of sufficient funds, to file such returns; and (e) shall timely pay all taxes arising under any requirements or tax returns applicable to the Plan.

## 13.     Periodic Reports and United States Trustee's Fees

The Debtor's obligation of filing monthly financial reports with the United States Trustee shall pass to and become the obligation of the Liquidating Debtor and the Plan Agent as applicable and such obligation shall continue following Confirmation until the obligation to pay the United States Trustee's fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) ends, except such monthly reports will be filed periodically. The Plan Agent shall be responsible for satisfying this obligation on behalf of the Liquidating Debtor. The Plan Agent shall prepare, sign, and file all Post-Confirmation reports and shall pay any U.S. Trustee's fees due and owing from the funds of the Liquidating Debtor. Copies of such reports shall be served on the United States Trustee and on any Claimant requesting continued service of same.

## 14.     Assignment and Prosecution of Rights of Action.

Pursuant to and in accordance with §§ 105(a), 1123(b)(3), and 1141(b) of the Bankruptcy Code and except as provided below, upon the entry of the Confirmation Order, all Rights of Action shall be, and hereby are reserved, retained, and vested in the Liquidating Debtor for the benefit of holders of Allowed Claims and Allowed Equity Interests pursuant to the terms of the Plan. All Rights of Action shall survive and continue Post-Confirmation, free and clear of all liens, claims, interests, encumbrances, defenses of res judicata, waiver, laches and estoppel, for investigation, prosecution, enforcement, settlement, abandonment, adjustment, or collection by the Liquidating Debtor for the benefit of the holders of the Allowed Claims and Allowed Equity Interests. The Plan Agent shall be authorized and have standing to pursue Rights of Action on behalf of, and in the name of, the Liquidating Debtor.

### a.     Notice to Prosecutable Targets.

Without limiting the generality of the foregoing subparagraph (a), all Claimants and other parties in interest are hereby expressly advised and notified that the Liquidating Debtor shall have the right to investigate, prosecute, enforce, settle, adjust, collect, or otherwise dispose of the Rights of Action. (A) ALL CLAIMANTS, PERSONS, ENTITIES, AND OTHER PARTIES WHO RECEIVED DIRECTLY OR INDIRECTLY, PAYMENTS, OFFSETS, RECOUPMENTS AND/OR REBATES, OR TRANSFERS OF PROPERTY FROM THE DEBTORS WITHIN THE ONE (1) YEAR PERIOD PRECEDING THE PETITION DATE OR WITHIN SUCH LONGER PERIOD OF TIME AS MAY APPLY UNDER APPLICABLE LAW INCLUDING, WITHOUT LIMITATION, PERSONS INCLUDED IN THE "LIST OF RIGHTS OF ACTION TARGETS," WHICH INCLUDES A LIST OF PAYMENTS MADE

WITHIN 180 DAYS PRIOR TO THE PETITION DATE ATTACHED AS EXHIBIT "B" TO THIS DISCLOSURE STATEMENT ARE HEREBY NOTIFIED THAT THEY MAY BE SUBJECT TO SUIT TO RECOVER ANY PREFERENCES, FRAUDULENT TRANSFERS, OR OTHER AVOIDABLE TRANSFERS AND TO PURSUE ANY RIGHTS OF ACTION. The inclusion of a Person in, or the omission of a Person from, Exhibit B to this Disclosure Statement does not mean that a decision has been made to assert, or not to assert, a Rights of Action against such Person. At this time, no determination has been made to pursue any particular Rights of Action. (B) In addition, all current and former officers, directors, shareholders, members, employees, partners, investors, agents, attorneys, accountants, equity holders, responsible parties and any other professional Person are hereby notified that they may be subject to an action under applicable law as a result of any action or inaction, decision or lack of decision or transaction or non-transaction, made or incurred Pre-Petition that resulted, directly or indirectly, in the commencement of the Case ("Derivative Claims"). The Liquidating Debtor shall review the Debtor's books and records, including the payments listed in Exhibit B to this Disclosure Statement, and other available information to determine whether any Rights of Action should be filed by the Liquidating Debtor.

### b. Reservation of Rights of Action.

The Liquidating Debtor specifically reserves the Rights of Action and, by setting forth notice to each currently known potential target of such a Rights of Action, expressly reserves such rights to survive beyond Confirmation, the finality of Confirmation, and all other legal effects of such Confirmation, provided, however, this reservation shall not mean and shall not be construed to mean that the exclusion of any Person from Exhibit B frees, releases or exonerates any Person from a Rights of Action by way of any defenses, and the Liquidating Debtor, the Plan Agent and their respective counsel shall have the right to investigate, pursue, prosecute and collect any unknown, but later discovered, Rights of Action against any Person.

### c. Notice in Confirmation Order.

The Court shall include in the Confirmation Order appropriate provisions incorporating the terms set forth in Section 6.15 of the Plan including, but not by way of limitation, the survival of the Rights of Action from the defense of res judicata, waiver, laches, and estoppel as to the Rights of Action and any other unknown but later discovered Claim or Claims after Confirmation and the approval of a grant of derivative jurisdiction for the Liquidating Debtor to prosecute the Rights of Action on behalf of the Debtor.

### d. Discretion to Pursue or Settle and Immunity of the Parties.

The Liquidating Debtor and the Plan Agent as applicable shall have discretion to pursue or not to pursue, to settle or not to settle, or to try or not to try, and/or to appeal or not to appeal the Rights of Action as they determine in the exercise of their business judgment and without any further approval of the Bankruptcy Court thereof. The Liquidating Debtor, the Plan Agent, and their respective attorneys or other professionals shall have no liability for the outcome of their decisions.

### 15.     Provisions Relating to Default

Upon and after the Effective Date, the following provisions shall be applicable to the Liquidating Debtor:

**a.     Default of Plan.**  The Plan shall go into "default" upon the occurrence of any one or more of the following events: (a) the Liquidating Debtor's material failure to file their periodic reports as required by the Plan or (b) the Liquidating Debtor's substantial and material failure to comply with any of the provisions of the Plan.

**b.     Remedies in Case of Default.**  Upon default, any Claimant shall have the right to report such default to the Bankruptcy Court and seek an appropriate remedy, which can include dismissal, conversion, or such other remedy decided by the Court in its discretion as being in the best interest of holders of Allowed Claims under the Plan; provided, however, that any default that is cured by the Liquidating Debtor or Plan Agent shall not constitute cause for continued pursuant of remedies pursuant to Section 6.16 of the Plan.

### 16.     Closing of the Debtor's Case

If, after the Effective Date, the Case is closed, such closing, (a) shall not alter, amend, revoke, or supersede the terms of the Plan, (b) shall not affect any rights of the Debtor, the holders of Claims or Equity Interests or the treatment of any other Person under the Plan, (c) shall continue to cause the terms of the Plan to remain binding on all Persons, (d) shall cause all orders of the Court to remain in full force and effect, and (e) shall cause the Bankruptcy Court to retain all jurisdiction set forth in Article 12 of the Plan.

### G.     Conditions Precedent to Effectiveness of Plan

### 1.     Conditions to the Effective Date

The Effective Date will not occur, and the Plan will not be consummated unless and until the following conditions have been satisfied or duly waived pursuant to Section 10.2 of the Plan:

**a.**     The Confirmation Order, with the Plan and all exhibits and annexes to each, shall have been entered by the Bankruptcy Court, and shall be a Final Order, and no request for revocation of the Confirmation Order under § 1144 of the Bankruptcy Code shall have been made, or, if made, shall remain pending; *provided, however*, that if the Confirmation Order has not become a Final Order because a notice of appeal has been timely filed and the parties are not stayed or enjoined from consummating the Plan, Section 10.1(a) of the Plan shall be deemed satisfied unless the effect of the appeal could reasonably be expected to be adverse to the business, operations, property, condition (financial or otherwise) or prospects of the Liquidating Debtor.

**b.**     All actions, documents and agreements necessary to implement the Plan shall be in form and substance reasonably satisfactory to the Debtor and shall have been effected or executed as applicable.

### 2. Waiver of Conditions

The conditions set forth in Section 10.1 of the Plan may be waived by the Debtor, without any notice to any other parties-in-interest or the Bankruptcy Court and without a hearing.

### H. Treatment of Executory Contracts and Unexpired Leases

### 1. Rejection of Executory Contracts and Unexpired Leases

Except as otherwise provided in the Confirmation Order, pursuant to §§ 365(a) and 1123(b)(2) of the Bankruptcy Code, all remaining Executory Contracts and Unexpired Leases as such terms are used in Section 365 of the Bankruptcy Code that exist between the Debtor and any entity shall be deemed rejected as of the Effective Date, except for any Executory Contract or Unexpired Lease (i) that has been assumed, assumed and assigned or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, or (ii) as to which a motion for approval of the assumption, assumption and assignment or rejection has been filed prior to the Effective Date. Any claims arising from the rejection of an Executory Contract or Unexpired Lease ("Rejection Claims") shall be classified in Class 5 under the Plan.

### 2. Bar Date for Filing Rejection Claims

A Proof of Claim asserting a Rejection Claim shall be filed with the Plan Agent on or before the thirtieth (30th) day after the Effective Date or be forever barred from assertion of any Rejection Claim against and payment from the Liquidating Debtor.

### 3. Provisions Relating to Assumption Cure Claims.

Any monetary amounts by which any executory contract and unexpired lease to be assumed under the Plan is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtor on or before the Effective Date; provided, however, if there is a dispute regarding (i) the nature or amount of any Cure, (ii) the ability of the Liquidating Debtor or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption, Cure such dispute shall be resolved at the Confirmation Hearing.

### I. Procedures for Resolving and Treating Disputed Claims

### 1. Objections to Claims

The Plan Agent on behalf of the Liquidating Debtor shall have the exclusive right to object to Claims including but not limited to objections regarding the allowance, classification or amount of Claims, subject to the procedures and limitations set forth in the Plan, the Bankruptcy Rules, and the Bankruptcy Code; *provided, however*, that the deadline for the Liquidating Debtor and Plan Agent to file objections to Claims shall be ninety (90) days after the Effective Date, unless further extended by the Bankruptcy Court upon notice to the holders of the 20 largest General Unsecured Claims and all others requesting notice pursuant to Bankruptcy Rule 2002. All such objections shall be litigated to a Final Order except to the extent the Liquidating Debtor and Plan Agent, in their discretion, elect to withdraw any such objection or compromise, settle or

otherwise resolve any such objection, in which event the Liquidating Debtor and Plan Agent may settle, compromise or otherwise resolve any Disputed Claim without approval of the Bankruptcy Court.

2.    **No Distribution Pending Determination of Allowance of Disputed Claims; Distributions to be Made on Undisputed Balances of Partially Disputed Claims**.

No proceeds shall be distributed under the Plan on account of any Disputed Claim, unless and until such Claim becomes an Allowed Claim; *provided, however*, that, except as otherwise required by § 502(d) of the Bankruptcy Code, if a Claim is partially disputed, contingent or unliquidated but the balance of the Claim is undisputed, liquidated and not contingent (the "Undisputed Balance"), then distribution shall be made to the holder of the Claim on such Undisputed Balance and distribution shall be withheld on the part of the Claim that is disputed, unliquidated, or contingent unless and until such part becomes an Allowed Claim.

3.    **Reserve Accounts for Disputed Claims**

On or prior to the Initial Distribution Date and each Subsequent Distribution Date, the Plan Agent shall reserve Cash in an aggregate amount sufficient to pay each holder of a Disputed Claim (a) the amount of Cash that such holder would have been entitled to receive under the Plan if such Claim had been an Allowed Claim on the Initial Distribution Date, or (b) such lesser amount as the Court may estimate or may otherwise order (the "Disputed Claims Reserve")

4.    **Investment of Disputed Claims Reserve**

The Plan Agent shall be permitted, from time to time, to invest all or a portion of the Cash in the Disputed Claims Reserve in United States Treasury Bills (or in a fund that invests substantially all of its assets in United States Treasury securities), interest-bearing certificates of deposit, tax exempt securities or investments permitted by § 345 of the Bankruptcy Code, using prudent efforts to enhance the rates of interest earned on such Cash without inordinate risk. All interest earned on such Cash shall be held in the Disputed Claims Reserve and, after satisfaction of any expenses incurred in connection with the maintenance of the Disputed Claims Reserve, including taxes payable on such interest income, if any, shall be transferred out of the Disputed Claims Reserve and shall be used by the Liquidating Debtor in accordance with the Plan.

5.    **Allowance and Payment**

Except as otherwise provided herein, if, on or after the Effective Date, any Disputed Claim becomes an Allowed Claim, the Plan Agent shall, within 30 days after the date on which such Disputed Claim becomes an Allowed Claim or as soon thereafter as is practicable or upon a Subsequent Distribution Date, distribute from the Disputed Claims Reserve to the holder of such Allowed Claim the amount of distributions that such holder would have been entitled to receive under the Plan if such Claim had been an Allowed Claim on the Effective Date.

### 6. Release of Excess Funds from Disputed Claims Reserve

If at any time or from time to time after the Effective Date, there shall be Cash in the Disputed Claims Reserve in an amount in excess of the amount which the Plan Agent is required at such time to reserve on account of Disputed Claims under the Plan or pursuant to any order of the Bankruptcy Court, the Plan Agent may release such funds from the Disputed Claims Reserve to the Liquidating Debtor as such Cash will be distributed pursuant to the Plan.

### 7. Estimation

The Plan Agent or Liquidating Debtor may, at any time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to § 502(c) of the Bankruptcy Code regardless of whether there has been a previous objection to such Claim, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time, including during litigation concerning any objection to such Claim. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount may constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Plan Agent or the Liquidating Debtor may elect to pursue any supplemental proceedings to object to any ultimate payment of such Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another. On and after the Confirmation Date, Claims which have been estimated subsequently may be compromised, settled, withdrawn or otherwise resolved without further order of the Bankruptcy Court as provided in the Plan.

### J. Modification of Plan

The Debtor may propose amendments to or modifications of the Plan under § 1127 of the Bankruptcy Code at any time prior to the entry of the Confirmation Order. After the Confirmation Date, the Liquidating Debtor may remedy any defects or omissions or reconcile any inconsistencies in the Plan or in the Confirmation Order in such manner as may be necessary to carry out the purposes and intent of the Plan so long as the interests of Claimants are not materially and adversely affected.

### K. Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a distribution under the Plan is composed of indebtedness and accrued but unpaid interest thereon, such distribution shall, for United States federal income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

### L. Post-Confirmation Actions, Reports and Final Decree

After the Effective Date, the following events shall occur:

**1. Reports of Distribution**. The Plan Agent shall file with the Bankruptcy Court periodic reports of recoveries on Prosecutable Claims and disbursements to holders of

Allowed Claims under the Plan, with a copy to the United States Trustee, and any Claimant who requests a copy of same.

    **2.**  **Final Report**.  Upon completion of all distributions provided for herein, the Plan Agent shall file a report of final distribution with the Bankruptcy Court, with service on the United States Trustee, and any Claimant who requests a copy of same.

    **3.**  **Request for Post-Confirmation Notices and Filings**.  After the Effective Date, no Claimant will be served any notices, motions, reports or other filings in the Bankruptcy Court except as set forth in Section 13.5 of the Plan.  Any Claimant or other party-in-interest who desires service of post-Effective Date notice(s) required in the Plan must deliver a written request to the Liquidating Debtor and the Plan Agent requesting service of such notices.

## V.  CONFIRMATION OF THE PLAN

### A.  Introduction

    The Bankruptcy Code requires a bankruptcy court to determine whether a plan complies with the technical requirements of chapter 11 of the Bankruptcy Code before such plan can be confirmed.  It requires further that a disclosure statement concerning such plan is adequate and includes information concerning all payments made or promised by the plan proponent in connection with the plan.

    If the Plan is confirmed, the Debtor expects the occurrence of the Effective Date to depend on when the Plan is confirmed.  Confirmation of the Plan will not occur until the Debtor has closed on the sale of its assets.

    To confirm the Plan, the Bankruptcy Court must find that the requirements of the Bankruptcy Code have been met.  Thus, even if the requisite vote is achieved for the Voting Classes, the Bankruptcy Court must make independent findings respecting the Plan's conformity with the requirements of the Bankruptcy Code before it may confirm the Plan.  Some of these statutory requirements are discussed below.

### B.  Voting

    Pursuant to the Bankruptcy Code, only holders of Allowed Claims or Equity Interests that are Impaired under the terms and provisions of the Plan and that receive distributions thereunder are entitled to vote for acceptance or rejection of the Plan.  A holder of a Claim or Equity Interest whose legal, equitable, or contractual rights are altered, modified or changed by the proposed treatment under the Plan or whose treatment under the Plan is not provided for in section 1124 of the Bankruptcy Code is considered Impaired.  Pursuant to section 1126(f) of the Bankruptcy Code, holders of Claims that are Unimpaired are conclusively presumed to have accepted the Plan and are not entitled to vote.

    Votes on the Plan will be counted only with respect of Allowed Claims that (i) belong to a Voting Class or (ii) are otherwise permitted by the Bankruptcy Code to vote.

## C.    Acceptance

The Bankruptcy Code defines acceptance of a plan by an impaired class of claims as acceptance by holders of at least two-thirds in dollar amount, and more than one-half in number, of claims of that class that actually vote. The Bankruptcy Code defines acceptance of a plan by an impaired class of interests as acceptance by holders of at least two-thirds in dollar amount of interests of that class that actually vote. Acceptance of a plan need only be solicited from holders of claims or interests whose claims or interests are impaired and not deemed to have rejected the Plan. Except in the context of a "cram down" pursuant to section 1129(b) of the Bankruptcy Code, as a condition to confirmation of a plan the Bankruptcy Code requires that, with certain exceptions, each class of impaired claims or interests accepts the plan.

In the event the requisite vote is not obtained as to a particular Class or Classes of Claims or Equity Interests, the Debtor has the right, assuming that at least one Class of Impaired Claims or Equity Interests has accepted the Plan, to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code. Section 1129(b) permits confirmation of a plan notwithstanding rejection by one or more classes of impaired claims or interests if the bankruptcy court finds that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the rejecting class or classes. This procedure is commonly referred to in bankruptcy parlance as "cram down." As such, if any Voting Class votes to reject the Plan the Debtor will request confirmation of the Plan under section 1129(b) of the Bankruptcy Code. The Debtor will proceed with a section 1129(b) cram down if all classes do not vote to accept the Plan.

## D.    Confirmation of the Plan

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied with respect to the Plan. Section 1129(a) of the Bankruptcy Code requires that, among other things, for a plan to be confirmed:

- The plan satisfies the applicable provisions of the Bankruptcy Code.

- The proponent of the plan has complied with the applicable provisions of the Bankruptcy Code.

- The plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised by the proponent under the plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the plan and incident to the case, has been disclosed to the bankruptcy court, and any such payment made before the confirmation of the plan is reasonable, or if such payment is to be fixed after confirmation of the plan, such payment is subject to the approval of the bankruptcy court as reasonable.

- The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer or trustee of the debtor, an affiliate of the debtor participating in the plan with the debtor, or a successor to the

debtor under the plan. The appointment to, or continuance in, such office of such individual must be consistent with the interests of creditors and with public policy and the proponent must have disclosed the identity of any insider that the Liquidating Debtor will employ or retain, and the nature of any compensation for such insider.

- With respect to each class of impaired claims or interests, either each holder of a claim or interest in such class has accepted the plan, or will receive or retain under the plan on account of such claims or interests, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code.

- Each class of claims has either accepted the plan or is not impaired under the plan, subject to the cramdown provisions of the Bankruptcy Code.

- Except to the extent that the holder of a claim has agreed to a different treatment of such claim, the plan provides that allowed administrative claims and priority claims (other than tax claims) will be paid in full on the effective date and that priority tax claims will receive on account of such claims deferred cash payments, over a period not exceeding six (6) years after the date of assessment of such claim, of a value, as of the effective date, equal to the allowed amount of such claim.

- If a class of claims is impaired, at least one (1) impaired class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class.

- Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

Subject to receiving the requisite votes in accordance with section 1129(a)(8) of the Bankruptcy Code and the "cram down" of Impaired Classes voting against the Plan or not receiving any distribution under the Plan, the Debtor believes that (i) the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code, (ii) the Debtor has complied or will have complied with all of the requirements of chapter 11, and (iii) the Plan has been proposed in good faith.

Set forth below is a more detailed summary of the relevant statutory confirmation requirements.

### 1. Best Interests of Holders of Claims and Equity Interests

The "best interests" test requires that a bankruptcy court find either that all members of each impaired class have accepted the plan or that each holder of an allowed claim of each impaired class of claims will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.

Because this is a liquidating Plan, a liquidation analysis is not necessary.

### 2. Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan should not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor unless such liquidation or reorganization is proposed in the Plan. For purposes of determining whether the Plan meets this requirement, the Debtor has analyzed its ability to meet its obligations under the Plan. Since this is a liquidating Plan, there will be no need for further liquidation or financial reorganization of the Debtor.

### 3. Acceptance by Impaired Classes

A class is impaired under a plan unless, with respect to each claim of such class, the plan (i) leaves unaltered the legal, equitable and contractual rights to which the claim entitles the holder of such claim or interest; or (ii) notwithstanding a demand for accelerated payment (a) cures any default and reinstates the maturity of the obligation; (b) compensates the holder of such claim for damages incurred on account of reasonable reliance on contractual provisions; and (c) does not otherwise alter legal, equitable or contractual rights. A class that is not impaired under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances to such class is not required.

With respect to the Plan, holders of Claims in Class 4 are Unimpaired and are deemed to have accepted the Plan. Holders of Claims in Classes 2, 3, 5, and 6 are impaired and are entitled to vote to accept or reject the Plan. Equity Interests in Class 7 are impaired and are deemed to have rejected the Plan by virtue of receiving no distributions thereunder.

### 4. Cram Down

A plan is accepted by an impaired class of claims or interests if holders of at least two-thirds in dollar amount and a majority in number of claims or interests in that class vote to accept the plan. Only those holders of claims or interests who actually vote (and are entitled to vote) to accept or to reject a plan count in this tabulation. The Bankruptcy Code contains provisions for confirmation of a plan even if it is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it. These so-called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code. The Plan may be confirmed under the cramdown provisions if, in addition to satisfying the other requirements of section 1129 of the Bankruptcy Code, it (a) is "fair and equitable" and (b) "does not discriminate unfairly" with respect to each Class of Claims and Equity Interests that is impaired under, and has not accepted, the Plan. The "fair and equitable" standard, also known as the "absolute priority rule," requires, among other things, that unless a dissenting class of unsecured claims or interests receives full compensation for its allowed claims or interests, no holder of allowed claims or interests in any junior class may receive or retain any property on account of such claims or interests.

With respect to a dissenting class of secured claims, the "fair and equitable" standard requires that holders either (i) retain their liens and receive deferred cash payments with a value as of the effective date of the Plan equal to the value of their interest in property of the applicable estate or (ii) receive the indubitable equivalent of their secured claims.

The "fair and equitable" standard has also been interpreted to prohibit any class senior to a dissenting class from receiving under a plan more than 100% of its allowed claims.

The requirement that the Plan not "discriminate unfairly" means, among other things, that a dissenting Class must be treated substantially equally with respect to other Classes of equal rank. The Debtor does not believe that the Plan unfairly discriminates against any Class that may not accept or otherwise consent to the Plan.

The Debtor intends to seek "cram down" of the Plan on any impaired Class that does not vote to accept the Plan. Nevertheless, there can be no assurance that the Bankruptcy Court will determine that the Plan meets the requirements of section 1129(b) of the Bankruptcy Code.

### 5. Classification of Claims

The Debtor believes that the Plan meets the classification requirements of the Bankruptcy Code that require that a plan place each claim into a class with other claims that are "substantially similar."

### E. Effect of Confirmation of the Plan

### 1. Revesting of Assets

Except as otherwise explicitly provided in the Plan, on the Effective Date all property comprising the Estate (including Rights of Action) shall revest in the Debtor and, ultimately, in the Liquidating Debtor, free and clear of all Claims, Liens and Equity Interests of holders of Claims and Equity Interests (other than as expressly provided herein). As of the Effective Date, the Liquidating Debtor and the Plan Agent may operate its business and use, acquire, and dispose of property and settle and compromise Claims without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and the Confirmation Order.

### 2. Discharge of the Debtor

Pursuant to § 1141(d) of the Bankruptcy Code and, except as otherwise specifically provided in the Plan or in the Confirmation Order, the rights afforded and the payments and distributions to be made and the treatment under the Plan shall be in complete exchange for, and in full and unconditional settlement, satisfaction, discharge, and release of any and all existing debts and Claims of any kind, nature, or description whatsoever against the Debtor, the Liquidating Debtor, its property, the Debtor's assets, or the Estate, and shall effect a full and complete release, discharge, and termination of all Liens, security interests, or other claims, interests, or encumbrances upon all of the Debtor's assets and property. Further, all Persons are precluded from asserting, against any of the Debtor or the Liquidating Debtor or its respective successors, or any property that is to be distributed under the terms of the Plan, any Claims, obligations, rights, causes of action, or liabilities based upon any act, omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, other than as expressly provided for in the Plan, or the Confirmation Order, whether or not (a) a Proof of Claim based upon such debt is filed or deemed filed under § 501 of the Bankruptcy Code; (b) a Claim based upon such debt is Allowed; or (c) the Claimant based upon such debt has accepted

the Plan. Except as otherwise provided in the Plan or the Confirmation Order, all Claimants arising prior to the Effective Date shall be permanently barred and enjoined from asserting against the Liquidating Debtor or the Debtor, or their successors or property, or the Debtor's assets, any of the following actions on account of such Claim: (i) commencing or continuing in any manner any action or other proceeding on account of such Claim against the Liquidating Debtor, any of the Debtor, or the property to be distributed under the terms of the Plan, other than to enforce any right to distribution with respect to such property under the Plan; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Liquidating Debtor, the Debtor or any of the property to be distributed under the terms of the Plan, other than as permitted under sub-paragraph (i) above; (iii) creating, perfecting, or enforcing any Lien or encumbrance against property of the Liquidating Debtor, any of the Debtor, or any property to be distributed under the terms of the Plan; (iv) asserting any right of setoff, subrogation, or recoupment of any kind, directly or indirectly, against any obligation due the Debtor, the Liquidating Debtor, their assets or any other property of the Debtor, the Liquidating Debtor, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan. The foregoing discharge, release and injunction are an integral part of the Plan and are essential to its implementation. The Debtor and the Liquidating Debtor shall have the right to independently seek the enforcement of the discharge, release and injunction set forth in Section 11.2 of the Plan. The provisions of this section shall be fully applicable and enforceable as to Equity Interests and the holders of Equity Interests in the event that the Sale Alternative is confirmed.

### 3.  No Waiver of Discharge

Nothing in the Plan shall be deemed to waive, limit, or restrict in any way the discharge granted to the Debtors upon Confirmation of the Plan by § 1141 of the Bankruptcy Code.

### 4.  Binding Effect

As of the Effective Date, the Plan shall be binding upon and inure to the benefit of the Debtor, the Liquidating Debtor, all Claimants and holders of Equity Interests, other parties-in-interest and their respective heirs, successors, and assigns.

### 5.  Term of Injunctions or Stays

Unless expressly modified or lifted by the Bankruptcy Court, all injunctions or stays provided for in the Case pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until 30 days after the Final Distribution Date.

### 6.  Setoffs

Except with respect to Claims specifically Allowed under the Plan, the Debtor or the Liquidating Debtor, as applicable, may, but shall not be required to, set off against any Claim, and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever that the Debtor may have against such Claimant; but neither the

failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor or the Liquidating Debtor of any such claim that the Debtor or the Liquidating Debtor may have against such Claimant.

## 7. Exculpation

Neither (a) the Plan Agent or any of its employees, officers, directors, agents, representatives, affiliates, attorneys, financial advisors, or any other professional persons employed by it, nor (b) each Professional for the Debtor or any of their employees, officers, directors, agents, representatives, affiliates, attorneys, financial advisors, or any other professional persons employed by any of them (the persons identified in (a) and (b) are collectively referred to as "Protected Persons," shall have or incur any liability to any Person or Entity under any theory of liability for any act or omission occurring on or after the Petition Date in connection with or related to the Debtor, the Case or the Estate, including but not limited to (i) formulating, preparing, disseminating, implementing, confirming, consummating or administering the Plan (including soliciting acceptances or rejections thereof); or (ii) the disclosure statement or any contract, instrument, release or other agreement or document entered into or any action take or omitted to be taken in connection with the Plan except for acts constituting willful misconduct or gross negligence and in all respects such Protected Persons shall be entitled to rely in good faith upon the advice of counsel. In any action, suit or proceeding by any Person contesting any action by, or non-action of, any Protected Person as constituting willful conduct or gross negligence or not being in good faith, the reasonable attorneys' fees and costs of the prevailing party will be paid by the losing party; and as a condition to going forward with such action, suit or proceeding at the outset thereof all parties thereto will be required to provide appropriate proof and assurances of their capacity to make such payments of reasonable attorneys' fees and costs in the event they fail to prevail.

## 8. Indemnification.

The Liquidating Debtor shall indemnify each Person identified as a Protected Person against any and all costs and expenses (including attorneys' fees) incurred by any of them in defending against post-Confirmation Date claims that are based on actions allegedly taken (or not taken) by them in their respective capacities relating to the Debtor, the Liquidating Debtor or the Plan; provided, however, that no Protected Person shall be entitled to indemnification under the Plan for the costs and expenses of defending a cause of action in which it is ultimately judicially determined that such Protected Person was grossly negligent or acted fraudulently or with willful misconduct in performing such Protected Person's duties hereunder or under any Final Order of the Bankruptcy Court or applicable law. Any Protected Person entitled to indemnification shall have a priority distribution right that is senior to the holders of Allowed Claims in Classes 4, 5, 6 and 7. The Plan Agent may use Liquidating Debtor's assets (as an expense of consummating the Plan) to purchase indemnification insurance to satisfy any potential indemnification claims that may arise under Section 11.8 of the Plan.

## VI.    CERTAIN RISK FACTORS TO BE CONSIDERED

**HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND INCORPORATED BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR TO REJECT THE PLAN.   THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.**

### A.    Risk that Distributions will be Less than Estimated by the Debtor

The distributions and recoveries for holders of Claims set forth in this Disclosure Statement are based on the Debtor's estimate of Allowed Claims as of_____, 2010.  The Debtor projects that the Claims asserted against it will be resolved in and reduced to an amount that is significantly lower than its estimates and may seek an order or orders from the Bankruptcy Court estimating the maximum dollar amount of Allowed Claims and Disputed Claims in various Classes or otherwise determining and fixing the amount of any Disputed Claims Reserve. There can be no assurance, however, that such estimates will prove accurate.  In addition, if and to the extent the Debtor has underestimated the amount of any Allowed Claims or Disputed Claims, the Debtor could be required to redirect Cash to such Allowed Claims or Disputed Claims, resulting in, among other things, a potential reduction of cash available for operations. Therefore, the distributions discussed herein could significantly and materially differ from the actual distributions made under the Plan.

The Debtor reserves the right to object to the amount or classification of any Claim. Thus, the estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim whose Claim is subject to a successful objection.  Any such holder may not receive the estimated distributions set forth herein.

### B.    Risk of Non-Confirmation of the Plan

If the Plan is not confirmed and consummated, there can be no assurance that the Debtor's chapter 11 case will continue rather than be converted to a liquidation under chapter 7 of the Bankruptcy Code or that an alternative plan would be on terms as favorable to the holders of Allowed Claims as the terms of the Plan.

### C.    Non-Consensual Confirmation of the Plan

Pursuant to the "cram down" provisions of section 1129(b) of the Bankruptcy Code, the Bankruptcy Court can confirm the Plan without the acceptances of all Impaired Classes of Claims, so long as at least one Impaired Class of Claims has accepted the Plan.

### D.    The Sale May Not Close

The proposed sale of all of the Debtor's assets may not close.  Additionally, there may be downward adjustments to the proposed Purchase Price.

## VII. CERTAIN TAX CONSEQUENCES OF THE PLAN

THE FOLLOWING DISCUSSION SUMMARIZES CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN TO THE DEBTOR AND HOLDERS OF CLAIMS. THIS DISCUSSION IS BASED ON THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "TAX CODE"), THE TREASURY REGULATIONS ISSUED (IN FINAL OR TEMPORARY FORM) THEREUNDER, JUDICIAL DECISIONS AND CURRENT INTERNAL REVENUE SERVICE ("IRS") ADMINISTRATIVE DETERMINATIONS IN EFFECT AS OF THE DATE OF THIS DISCLOSURE STATEMENT. CHANGES IN THESE AUTHORITIES, WHICH MAY HAVE RETROACTIVE EFFECT, OR NEW INTERPRETATIONS OF EXISTING AUTHORITY MAY CAUSE THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO DIFFER MATERIALLY FROM THE CONSEQUENCES DISCUSSED BELOW. THE TAX CONSEQUENCES OF CERTAIN ASPECTS OF THE PLAN ARE UNCERTAIN DUE TO THE LACK OF APPLICABLE LEGAL AUTHORITY AND MAY BE SUBJECT TO ADMINISTRATIVE OR JUDICIAL INTERPRETATIONS THAT DIFFER FROM THE DISCUSSION BELOW. MOREOVER, NO RULINGS HAVE BEEN OR WILL BE REQUESTED FROM THE IRS AND NO LEGAL OPINIONS HAVE BEEN OR WILL BE REQUESTED FROM COUNSEL WITH RESPECT TO ANY TAX CONSEQUENCES OF THE PLAN.

THIS DISCUSSION DOES NOT COVER ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO THE DEBTORS OR TO HOLDERS OF CLAIMS. FOR EXAMPLE, THE DISCUSSION PROVIDED BELOW DOES NOT ADDRESS ISSUES OF SPECIAL CONCERN TO CERTAIN TYPES OF TAXPAYERS, SUCH AS DEALERS IN SECURITIES, LIFE INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, BANKS, SMALL BUSINESS INVESTMENT COMPANIES, MUTUAL FUNDS, REGULATED INVESTMENT COMPANIES, TAX EXEMPT ORGANIZATIONS AND FOREIGN TAXPAYERS. THE DISCUSSION, MOREOVER, IS LIMITED TO FEDERAL INCOME TAX CONSEQUENCES AND DOES NOT ADDRESS STATE, LOCAL OR FOREIGN TAXES.

THIS DISCUSSION IS INCLUDED FOR GENERAL INFORMATION ONLY. THE DEBTOR AND ITS COUNSEL ARE NOT MAKING ANY REPRESENTATIONS REGARDING THE PARTICULAR TAX CONSEQUENCES OF CONFIRMATION AND CONSUMMATION OF THE PLAN WITH RESPECT TO THE DEBTOR, DIRECTORS OR OFFICERS OF THE DEBTOR OR HOLDERS OF CLAIMS. FURTHER, THE DEBTOR AND ITS COUNSEL ARE NOT RENDERING ANY FORM OF LEGAL OPINION OR TAX ADVICE ON SUCH TAX CONSEQUENCES. THE TAX LAWS APPLICABLE TO CORPORATIONS (INCLUDING THE DEBTOR) IN BANKRUPTCY ARE EXTREMELY COMPLEX AND THE FOLLOWING SUMMARY IS NOT EXHAUSTIVE. FOR THESE REASONS, THE DISCUSSION IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND PROFESSIONAL TAX ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM. HOLDERS OF CLAIMS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL, FOREIGN AND OTHER TAX CONSEQUENCES OF THE PLAN.

A Holder may be subject to backup withholding at applicable rates with respect to consideration received pursuant to the Plan, unless the holder (i) is a corporation or comes within another category of persons exempt from backup withholding and, when required, demonstrates this or (ii) provides a correct taxpayer identification number ("TIN") on Internal Revenue Service Form W-9 (or a suitable substitute form) and provides the other information and makes the representations required by such form and complies with the other requirements of the backup withholding rules. An otherwise exempt holder may become subject to backup withholding if, among other things, the holder (i) fails to properly report interest and dividends for federal income tax purposes or (ii) in certain circumstances, fails to certify, under penalty of perjury, that it has furnished a correct TIN. A holder that does not provide a correct TIN also may be subject to penalties imposed by the IRS.

Backup withholding is not an additional tax. The federal income tax liability of a person subject to backup withholding is reduced by the amount of tax withheld. If withholding results in an overpayment of federal income tax, the holder may obtain a refund of the overpayment by properly and timely filing a claim for refund with the IRS.

The Debtor and Plan Agent may be subject to other withholding and information reporting obligations with respect to consideration distributed pursuant to the Plan and will comply with all such obligations and information reporting obligations.

## VIII. CONCLUSION AND RECOMMENDATION

The Debtor believes that confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will provide the greatest recoveries to holders of Claims. In addition, other alternatives would involve delay, uncertainty and substantial additional administrative costs. The Debtor urges holders of impaired Claims entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their ballots so that they will be received not later than 4:00 p.m., Houston time, on _____, 2010

Dated:   September 17, 2010

Respectfully submitted,

CryptoMetrics, Inc., Debtor

By:_____/s/ Danny W. Mills_____
    President of CryptoMetrics, Inc.