# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | Chapter 11 |
| CRYPTOMETRICS, INC., | § | |
| | § | |
| Debtor. | § | CASE NO. 10-53622 |

**MOTION OF THE DEBTOR FOR AN ORDER (I) APPROVING FORM
OF STALKING HORSE APA, (II) APPROVING BIDDING PROCEDURES FOR AN
AUCTION OF DEBTOR'S ASSETS, (III) SCHEDULING A DATE FOR
THE AUCTION, (IV) APPROVING THE FORM OF PROPOSED NOTICE
OF AUCTION AND SALE HEARING, AND (V) SETTING CERTAIN DATES
<u>RELATED TO THE SALE OF THE DEBTOR'S ASSETS</u>**

**THIS PLEADING REQUESTS RELIEF THAT MAY BE ADVERSE TO YOUR INTERESTS.**

**IF NO TIMELY RESPONSE IS FILED WITHIN TWENTY (21) DAYS FROM THE DATE OF SERVICE, THE RELIEF REQUESTED HEREIN MAY BE GRANTED WITHOUT A HEARING BEING HELD.**

**A TIMELY FILED RESPONSE IS NECESSARY FOR A HEARING TO BE HELD.**

TO THE UNITED STATES BANKRUPTCY JUDGE:

CryptoMetrics, Inc., debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Debtor"), files this Motion for an Order (I) Approving Form of Stalking Horse APA, (II) Approving Bidding Procedures for an Auction of Debtor's Assets, (III) Scheduling a Date for the Auction, (IV) Approving the Form of Proposed Notice of Auction and Sale Hearing, and (V) Setting Certain Dates Related to the Sale of the Debtor's Assets (the "Motion"). In support of the Motion, the Debtor respectfully represents as follows:

# I.
# JURISDICTION

1. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The relief requested is available pursuant to 11 U.S.C. § 363.

# II.
# BACKGROUND

## A. Business, Corporate and Financial Overview

2. CryptoMetrics, Inc. ("CryptoMetrics" or the "Debtor") is a biometric security company with offices currently in San Antonio, Texas. The Debtor previously had offices in Tuckahoe, New York. The Debtor is a holding company that owns one-hundred percent of the voting stock in two operating subsidiaries – (i) NextGenID, Inc. ("NextGen"), a Delaware Corporation, and (ii) CryptoMetrics Canada Incorporated ("CCI"), a corporation incorporated under Canadian law. From 2002 through 2008, the Debtor raised more than $60,000,000 in equity and debt from investors. Numerous rounds of financing occurred and the Debtor, based on available records, has approximately 400 shareholders located around the world. The Debtor is not publicly traded on any stock exchanges.

3. Prior to the involvement of current management, significant sums of money were paid out to agents and others persons around the world that appear at least to have been wasted funds and perhaps subsidized illegal activities. These payments are the subject of criminal investigations of the Debtor and certain individuals by the US Department of Justice, the FBI and the Royal Canadian Mounted Police. By November 2009, the Debtor had no cash, had significant debt and had very little to no revenue. Given the precarious financial condition of the Debtor, the pending investigations, and pursuant to an order of the Delaware Chancery Court, the Debtor held

a special shareholders meeting on November 30, 2009. To the best of the Debtor's knowledge this was the first shareholder meeting held even though the Debtor had been conducting business for many years. At the November shareholders meeting, Thomas O'Neill, Michael Vitale and Danny Mills were elected as Directors of the Debtor (the "Board"). Mr. O'Neill was subsequently appointed as Chairman and Treasurer, Mr. Vitale as Secretary, and Mr. Mills as President of the Debtor. These individuals continue to serve as members of the Board and as officers of the Debtor. John-Peter Bradford, a consultant to the Debtor's Canadian subsidiary, was originally appointed as a Director at a Board meeting that immediately followed the shareholders' meeting, however, he resigned at the end of February due to health reasons. The Board has requested that Mr. Bradford resume his duties as a Director and rejoin the Board and act as its chief restructuring advisor. On September 16, 2010, at a special meeting of the Board, Mr. Bradford was reappointed to the Board of Directors.

4. Since November 30, 2009, the officers and directors of the Debtor have undertaken the task of exploring alternatives for reorganizing, restructuring and recapitalizing of the Debtor. The Board has been actively engaged in investigating issues related to the apparent failure and insolvency of the Debtor. During this time, the Debtor had been pursuing all aspects of an out-of-court restructuring process, including attempts to bring short-term capital into the Debtor to allow for time to initiate a financial and operational restructuring. The Board's work revealed that the Debtor has significant outstanding debt, no material operations, and several large pending and threatened litigation claims. There are also the pending investigations discussed above by the US Department of Justice, the FBI and the Royal Canadian Mounted Police related to possible violations of the Foreign Corrupt Practices Act. These investigations have cast a cloud over the Debtor.

5. Concurrently with the Board's investigations, management has been actively trying

to stabilize the business of the Debtor's operating subsidiaries -- NextGen and CCI -- with a view to making the Debtor viable. Management has concluded that the Debtor's operating subsidiaries have the potential to be successful if (i) their debts and the Debtor's debts can be restructured, (ii) the ongoing criminal investigations can be resolved, and (iii) the employees can be assured ongoing and uninterrupted payment of wages and benefits, which means, among other things, acquiring sufficient working capital to ensure the solvency of the operating subsidiaries, and fund their operations for the near term.

6. In January 2009, the Debtor, under its prior management, entered into a loan agreement with MBRO Capital, LLC (the "MBRO Loan") whereby the Debtor borrowed $2,000,000 from MBRO secured by the entirety of the assets of the Debtor, as well as the personal guarantees of the two founders and co-CEOs. These personal guarantees were secured by the guarantors' respective stock in the Debtor. The MBRO Loan was intended to be a short term loan with the intention that it be repaid in less than 90 days. However, after one extension, the note went into default and remains in default today. MBRO filed suit against the former CEO, the Debtor's then legal counsel and others claiming, among other things, fraud and misrepresentation by the Debtor and the CEO. MBRO was prepared to foreclose on its collateral which secured the note in January of 2010. In an effort to avoid the foreclosure, Security Concepts Group, LLC ("SCG") purchased substantially all of the Debtor's secured debt. SCG is an entity owned by certain shareholders, officers and directors of the Debtor. Tom O'Neill, who is Chairman and Treasurer of CryptoMetrics, as well as a shareholder of CrytpoMetrics, is also a manager of SCG and owns approximately 5% of SCG. Danny Mills, who is President of CryptoMetrics, is also a manager of SCG and owns approximately 8% of SCG.

7. SCG purchased substantially all of MBRO's interest in the MBRO Loan. SCG also purchased the seller's note made by the Debtor to BioAccess Holdings, LLC in connection

4

with the Debtor's acquisition of Nextgen (the "NextgenID Loan"). As of the Petition Date, the outstanding balance of the MBRO Loan including unpaid interest and fees is approximately $3,423,170 and the outstanding balance of the NextgenID Loan including unpaid interest and fees is approximately $3,481,364. Both loans continue to be in default and are collateralized by the assets of the Debtor and Nextgen, respectively and, as such, represent the primary secured debt of the Debtor. Among other things, the acquisition of the MBRO Loan by SCG averted imminent foreclosure and allowed the Debtor time to pursue other strategies.

8. SCG has also loaned funds directly to the operating subsidiaries and to the Debtor. Those funds have been used to pay expenses, salaries, consulting fees, travel expenses and the vendor payables of the subsidiaries necessary to maintain current workflow, as well as Debtor legal and consulting fees and other miscellaneous corporate expenses. SCG has continued to fund the day-to-day operating expenses for the operating subsidiaries, CCI and Nextgen, on a month-by-month basis, allowing the Debtor the time to seek viable alternatives to bankruptcy. An amount of $500,000 was loaned by SCG to CCI on an unsecured basis; in addition, approximately $3,600,000 was loaned by SCG to Nextgen and CCI on a secured basis, with a guarantee provided by the Debtor. CCI's assets and the Debtor's assets were pledged as security for this loan and guarantee, respectively. In total, since March 2010, SCG has funded approximately $3,600,000 directly to the Debtor's operating subsidiaries in an effort to stabilize their businesses. With the exception of the initial $500,000 loan to CCI, all funds loaned by SCG are secured by the assets and stock of the subsidiaries and guaranteed on a secured basis by the Debtor. SCG's security interests are secondary in priority to the security interests granted by the Debtor in connection with the MBRO and Nextgen loans.

   **B.**  **Other Debtor Related Matters**

     *1.*  *CryptoMetrics Canada, Inc. ("CCI")*

9. On March 29, 2010, CCI filed with the Canadian bankruptcy court for a "Proposal" under the Bankruptcy and Insolvency Act ("BIA") in Canada. This began a process which allowed CCI a time to negotiate settlements with its unsecured creditors while maintaining control of its operations. CCI retained a Trustee to oversee the process and sent required notices to all known creditors. The total CCI debt subject to the proposal process exceeded $4,200,000 (including past wages due to employees).

10. On June 11, 2010, CCI filed its Proposal and a meeting of creditors was held on June 30, 2010. At that meeting, CCI's creditors approved the Proposal which allows CCI to settle the obligations covered by the Proposal for approximately ten cents on the dollar. The Canadian Bankruptcy Court approved the Proposal in early August 2010 and CCI is now operating with relief obtained from the completion of the Proposal process.

11. As a part of the BIA Proposal process, efforts were made to retain control of and protect the intellectual property ("IP") and know-how associated with CCI. As such, based on the advice of Canadian counsel, NextgenID-Canada, Inc. ("Nextgen-Canada") was formed as a wholly owned subsidiary of Nextgen. Nextgen-Canada entered into a license agreement with CCI under which Nextgen-Canada licenses all technology necessary for the go forward operations from CCI. Payments under the license agreement from Nextgen-Canada to CCI will fund the payments to CCI's creditors covered by the Proposal. It is important to note that no IP or other assets have been transferred out of CCI. Rather these assets are serving as collateral for the loans SCG and Nextgen have made and intend to make to CCI in order to keep CCI's operations going. If those loans are not repaid, SCG and Nextgen will have the right to foreclose on the collateral.

12. At this time there is no intention of having to utilize NextgenID-Canada as the go-forward entity, as CCI has resolved most of its issues with creditors through completion of the

Proposal process. Accordingly, NextgenID-Canada will remain as a shell company for the foreseeable future.

*2.    United Arab Emirates*

13.    Prior management focused almost all of their efforts on obtaining a contract to supply the Debtor's technology to the United Arab Emirates. Prior management claimed that they had secured a contract worth "hundreds of millions" of dollars with the UAE Ministry of Interior ("MOI"). The existence of this "contract" was used as the basis for raising significant amounts of capital and for a failed reverse merger by the Debtor with a public shell company in 2008.

14.    As it turns out, there are significant issues with this contract, and CryptoMetrics' business efforts in the UAE. Chief among these is the DoJ investigation into alleged violations of the Foreign Corrupt Practices Act. Additionally, the contract which was to generate the UAE business was negotiated and entered into by Robert Barra ("Barra") and Joel Shaw ("Shaw"), both former management of the Debtor, through BioDentity Systems LLC ("BioDentity") of the UAE, and is very one sided in favor of the MOI. The contract has a 25-year term and provides the MOI the right to use Debtor's technology. However, the MOI is not locked in by this contract and is free to use technology supplied by others, at their sole discretion. Moreover, whether or not the MOI exercised its right to purchase competing technology, the contract prohibits the Debtor from selling its technology anywhere in the Middle East North Africa ("MENA") region except through BioDentity. BioDentity was incorporated in Abu Dhabi at the direction of Barra and Shaw to be ultimately owned 51% by UAE interests and 49% by the Debtor's shareholders. While the record is not entirely clear, upon information and belief, CryptoMetrics' shareholders' interest is now held 80% by Barra and 20% by Shaw. Thus, whatever benefits were to flow from the UAE business to the Debtor were structured so they would be controlled by Barra and Shaw, not by the Debtor.

7

15. It is now believed that the MOI has no intention of moving forward with the Debtor's technology and is focused on obtaining repayment of a $5,000,000 unsecured loan it made to the Debtor in May 2008. The current management of the Debtor has been negotiating with representatives of the MOI with the following objectives in mind:

- Termination of the existing agreement, and other related agreements, thus freeing the Debtor of its restrictive provisions; and
- Allowing the MOI to sell the $5,000,000 loan to a third party which would permit the MOI to recoup the amount of its loan, but conditioning such sale on the buyer agreeing to extend the term of the loan for an additional 18 months.

16. This proposal has been pending before the MOI's representatives for over five months and still has not been accepted or approved by them. Although not yet confirmed, upon information and belief, prior CryptoMetrics management (Barra, Shaw and others) and certain other shareholders are taking steps in the UAE which are interfering with the conclusion of these negotiations. The $5,000,000 debt to the MOI, which is now due at any time on demand, was a significant factor in the decision to file for bankruptcy protection. The Debtor believes that it may have avoidance claims against the MOI related to the incurrence of the $5,000,000 debt to the MOI and expressly reserves the right to assert these claims on behalf of its estate.

### C. Litigation Against the Debtor

17. The Debtor is a defendant in three lawsuits, one by the past CFO seeking $3,000,000 in damages, one by an agent from the UAE seeking $25,000,000 in damages, and the third by one of the several law firms not paid by prior management. The lawsuits are problematic in that the Debtor does not have the time and money to respond to them, and the Debtor would be unable to satisfy any significant judgment in any one of these suits, should the plaintiffs prevail on their claims. In addition to these three lawsuits, other litigation may be brought by other creditors, including the MOI seeking repayment of its $5,000,000 unsecured loan as noted above.

### D. Decision to File Chapter 11

18. In summary, the Debtor has been facing significant challenges. The principal challenge facing the Debtor continues to be its need to raise additional funds, and the method by which that might be done. The Debtor has pursued alternatives to bankruptcy for the past 10 months but has been unsuccessful on all accounts. Potential investors contacted by the Debtor during the several months leading up to the bankruptcy filing have made it clear that they will not invest in the Debtor unless the Debtor can cleanse itself of many (if not all) of the claims and contingencies it faces. Having taken all available steps to avoid bankruptcy, the Board determined that bankruptcy is the only viable alternative, and, as such, directed the Debtor to initiate a chapter 11 bankruptcy proceeding in San Antonio, Texas.

### E. Proposed Sale

19. The Debtor has determined that the only way to bring value to the stakeholders of the Debtor is to sell the Assets of the Debtor. SCG has offered to buy the subsidiaries (Nextgen and CCI), along with any related intellectual property of the Debtor, for the value of its secured claims against the Debtor (approximately $10.5 million) plus a cash payment in the amount of $150,000. An "Asset Purchase Agreement" has been executed by SCG. Moreover, the Debtor has been actively seeking other viable purchasers of the subsidiaries and the Debtor is seeking Court approval for an auction in November, 2010. The Debtor believes that this auction and sale process provides the greatest opportunity to maximize value for stakeholders.

20. It is important to note that SCG could have sought to foreclose its liens on the Debtor's Assets for the value of its claims. However, SCG instructed the Debtor that it would prefer to purchase the subsidiaries out of bankruptcy in an effort to maximize value to the stakeholders of the Debtor. This alternative was viewed as very beneficial by the Board of the Debtor since a foreclosure would likely have yielded no value to stakeholders. Moreover, the

Debtor requested that SCG provide a cash component to its bid and, in response to the Debtor's request, SCG agreed to bid its claims plus $150,000 in cash. In consideration for the credit bid of SCG's secured claims and the cash payment from SCG to the Debtor, the Debtor proposes to release any and all claims against SCG as part of this transaction. The cash portion of SCG's bid is viewed as extremely valuable to the Debtor since the Debtor does not have any other available cash with which it could fund litigation and pursue various claims for the benefit of its stakeholders.

### F. Claims of the Debtor

21. The Debtor believes that there are certain claims that exist against various parties, including former management. The Debtor's Plan proposes to preserve those claims for stakeholders. Moreover, it is anticipated that the $150,000 in cash provided by SCG (or more if there are overbids) will be used to help fund such litigation for the benefit of the Debtor's stakeholders.

### G. Liquidating Plan

22. The Plan proposes to sell the majority of the Debtor's Assets to the highest bidder and reorganize the Debtor as a "Liquidating Debtor." Post-Effective Date, the Debtor's equity interests will be cancelled and new equity interests in the Liquidating Debtor will be issued to the Plan Agent. The Plan Agent is charged with (i) pursuing any other remaining assets of the Debtor such as legal actions and claims (as described above), (ii) monetizing such assets, legal actions and claims for the benefit of stakeholders, (iii) making distributions in accordance with the Plan, and (iv) winding-down the Liquidating Debtor upon completion of the case. The Debtor will disclose the identity of the Plan Agent within 10 days prior to the Confirmation Hearing.

# III.
# SUMMARY OF RELIEF REQUESTED

23. The Debtor is a holding company that owns one-hundred percent of the voting stock in two operating subsidiaries – (i) NextGenID, Inc. ("NextGen"), a Delaware Corporation, and (ii) CryptoMetrics Canada Incorporated ("CCI"), a corporation incorporated under Canadian law. NextGen and CCI are not debtors. Pursuant to the Stalking Horse APA (defined below), the Debtor has agreed to sell the stock that its owns in NextGen and CCI to SCG or the highest and best bidder subject to the Bidding Procedures (defined below) after conducting an auction.

24. By this Motion, the Debtor seeks approval of form of the asset purchase agreement (the "Stalking Horse APA") attached hereto as **Exhibit "A,"** by and among Security Concepts Group, LLC ("SCG" or the "Stalking Horse Bidder") and the Debtor. The Debtor further seeks approval of the proposed bidding procedures attached as **Exhibit "B"** hereto (the "Bidding Procedures").

25. Concurrently with the filing of this Motion, the Debtor is filing its chapter 11 plan (the "Plan") and disclosure statement for the Debtor's Chapter 11 Plan (the "Disclosure Statement").

26. The Debtor has also filed a stand-alone motion to approve the sale of the Debtor's assets pursuant to Section 363 of the Bankruptcy Code subject to complying with the Bidding Procedures. The Debtor also seeks approval of certain hearing dates and deadlines associated with the Plan and Bidding Procedures sale process. The Debtor will present a separate scheduling order to the Court at the hearing on this Motion requesting the relevant dates and deadlines regarding the Bidding Procedures, Plan confirmation hearing (the "Confirmation Hearing") and hearing to approve the sale of the Assets (the "Sale Hearing").

# IV.
# RELIEF REQUESTED

## The Stalking Horse APA

27. The Debtor proposes to auction and sell the Shares (as defined in the Stalking Horse APA) and assign its right, title and interest in certain Patents (as defined in the Stalking Horse APA, and together with the Shares, the "Assets") in accordance with section 363 of the Bankruptcy Code. The Debtor and SCG have executed a Stalking Horse APA under which the Debtor would sell the Assets to the Stalking Horse Bidder for approximately $10,650,000 (the "Purchase Price"), subject to the Bidding Procedures and this Court's approval of the following:

A. **The Stalking Horse APA**[1]

   a. **General Terms.** SCG would acquire the Assets.

   b. **Bankruptcy Court Approval.** The sale of the Assets would be subject to approval by this Court and competitive bidding pursuant to the Bidding Procedures.

   c. **Purchase Price.** The Purchase Price to be paid by SCG for the Assets would be $10,650,000. The Purchase Price shall consist of SCG credit bidding its secured debt against the Debtor in the amount of $10,500,000[2] (the "SCG Secured Claim") plus paying a lump sum of cash to the Debtor in the amount of $150,000 to be used to fund payments to unsecured creditors under its Plan.

B. **The Break-Up Fee and Expense Reimbursement**

   a. In the event the Assets are not sold to SCG pursuant to the Stalking Horse APA, SCG shall receive a break-up fee equal to 1.5% of the Purchase Price ($159,750) (the "Break-Up Fee"). Such Break-Up Fee shall be paid without further order of the Bankruptcy Court from the proceeds of a sale of the Assets if the Assets are sold to a party that is not SCG.

   b. In the event the Assets are not sold to SCG pursuant to the Stalking Horse APA, SCG shall be reimbursed by the Debtor for any and all expenses of SCG, including but not limited to, any attorneys fees and expenses (the "Reimbursement Amount"). Such Reimbursement Amount shall be paid without further order of the

---

[1] The following is intended for summary purposes only. To the extent the description in this Motion is inconsistent in any way from the APA, the terms of the APA shall govern.

[2] In the event SCG's Secured Claim accrues interest, it is anticipated that SCG will bid its SCG Secured Claim plus interest, which will increase the Purchase Price.

12

Bankruptcy Court from the proceeds of a sale of the Assets if the Assets are sold to a party that is not SCG.

c. The amount of the Break-Up Fee and provision for the Reimbursement Amount, the conditions under which the Break-Up Fee is payable to the Stalking Horse Bidder, and the protections afforded the Stalking Horse Bidder to assure payment of the Break-Up Fee and Reimbursement Amount if such payment becomes due, are reasonable under the circumstances. The Stalking Horse Bidder has devoted substantial resources to the proposed transaction. The protections and covenants contained in the Stalking Horse APA and the Bidding Procedures for the benefit of the Stalking Horse Bidder reflect the amount of time and money that the Stalking Horse Bidder has invested in making its bid, and are commensurate with the benefits conferred upon the estates as a result of the bid.

### The Proposed Bidding Procedures for the Auction

28. The sale of the Assets to SCG would be subject to higher or otherwise better offers pursuant to the Bidding Procedures. The Debtor believes that the proposed structure of the Bidding Procedures is the one most likely to maximize the realizable value of the Assets for the benefit of the Debtor's estate, its stakeholders and other interested parties.

29. Accordingly, the Debtor seeks approval of the following Bidding Procedures for the sale of the Assets:

A. **Bidding Procedures**

   a. **Assets to be Sold**. The Auction shall consist of all of the Shares and the Patents, as defined in the Stalking Horse APA.

   b. **Confidentiality Agreements**. Upon execution of a valid confidentiality agreement, in form and substance satisfactory to the Debtor, any party that wishes to conduct due diligence on the Assets may be granted access to information that has been or will be provided to the other bidders.

   c. **Qualifying Bidders**. In order to participate in the bidding process and be deemed a "Qualifying Bidder," each potential bidder must submit a "Qualifying Bid" by the Bid Deadline (defined below). To constitute a Qualifying Bid, a bid must:

   i. Be in writing;

   ii. State that such bidder offers to purchase the Assets upon the terms and conditions substantially as set forth in the Stalking Horse APA;

13

iii.  State that such bidder is prepared to enter into a legally binding purchase and sale agreement or similar agreement for the acquisition of the Assets on terms and conditions no less favorable to the Debtor than the terms and conditions contained in the Stalking Horse APA;

iv.  Include a clean and duly executed Asset Purchase Agreement (the "Modified APA") and a "blacklined" comparison against the Stalking Horse APA to show any changes requested by the bidder. All Modified Purchase Agreements must be on substantially the same terms and subject to the same conditions as set forth in the Stalking Horse APA;

v.  State that such bidder is financially capable of consummating the transactions contemplated by the Modified APA;

vi.  Include such financial and other information that will allow the Debtor to make a reasonable determination as to the bidder's financial and other capabilities to consummate the transactions contemplated by the Modified APA;

vii.  Not request or entitle the bidder to any transaction or break-up fee, expense reimbursement, or similar type of payment;

viii.  Fully disclose the identity of each entity that will be bidding for the Assets or otherwise participating in connection with such bid, and the complete terms of any such participation;

ix.  Not contain any due diligence or financing contingencies of any kind;

x.  Include evidence of authorization and approval from the bidders' board of directors (or comparable governing body) with respect to the submission, execution, delivery, and closing of the Modified APA;

xi.  Include a cash deposit equal to ten (10%) percent of the amount offered to purchase the Assets (the "Good Faith Deposit").

xii.  Be in an amount at least the amount of the Break-Up Fee, plus the Reimbursement Amount[3] plus $100,000.00 greater than the Purchase Price (*i.e.*, $10,984,750)

---

[3]  It is estimated that the Reimbursement Amount will be approximately $75,000.

d.  The Debtor shall make a determination regarding whether a bid is a Qualifying Bid and shall notify bidders whether their bids have been determined to be Qualifying Bids by no later than 5:00 p.m. (Central Time) on November 16, 2010 or a date to be set by the Court.[4]

e.  **Bid Deadline**. Any person or entity interested in participating in the Auction must submit a Qualifying Bid on or before November 15, 2010 (the "Bid Deadline") in writing, to (1) counsel to the Sellers, Christopher Adams, Okin Adams & Kilmer LLP, 1113 Vine Street, Suite 201, Houston, Texas 77002; (2) counsel to SCG, Timothy A. Davidson II , Andrews Kurth LLP, 600 Travis, Suite 4200, Houston, Texas 77002.

f.  **Stalking Horse Bidder as Qualifying Bidder**. Notwithstanding clause (c) above, for the purposes of determining eligibility to attend and place bids at the Auction, SCG shall be considered a Qualifying Bidder.

g.  **Auction**. In the event that the Debtor timely receives one or more Qualifying Bids, in addition to the bid of SCG, the Debtor shall conduct the Auction with respect to the Assets. The Auction shall be conducted on November 18, 2010 at a location so ordered by the Court or such other location as designated by the Debtor in a notice to all Qualifying Bidders. The Auction shall be governed by the following procedures:

   i.   The Qualifying Bidders shall appear in person at the Auction, or through a duly authorized representative;

   ii.  Only representatives of the Debtor and the Qualifying Bidders shall be entitled to be present at the Auction;

   iii. Only the Qualifying Bidders shall be entitled to make any subsequent bids at the Auction;

   iv.  Each Qualifying Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale;

   v.   Bidding shall commence at the amount of the highest Qualifying Bid submitted by the Qualifying Bidders prior to the Auction;

   vi.  Qualifying Bidders may then submit successive bids in increments of at least $100,000 higher than the previous bid;

   vii. All Qualifying Bidders shall have the right to submit additional bids, subject to clause (vi) above, and make

---

[4] The exact dates and times will be set forth in a separate scheduling order to be presented to the Court at the hearing on this Motion.

      additional modifications to the Stalking Horse APA or Modified APA, as applicable, at the Auction;

   viii. The Auction will be conducted to achieve the maximum value for the Assets and may include individual negotiations with the Qualifying Bidders and/or open bidding in the presence of all other Qualifying Bidders; and

   ix. The Auction shall continue until there is only one offer that the Debtor determines, subject to Court approval, is the highest or best offer from among the Qualifying Bidders submitted at the Auction (the "Successful Bid"). In making this decision, the Debtor may consider, without limitation, the amount of the purchase price, the form of consideration being offered, the likelihood of the Qualifying Bidder's ability to close a transaction and the timing thereof, the number, type and nature of any changes to the Stalking Horse APA requested by each Qualifying Bidder, and the net benefit to the Debtor's estate. The Qualifying Bidder submitting such Successful Bid shall become the "Successful Bidder," and shall have such rights and responsibilities of a purchaser, as set forth in the applicable Modified APA.

 h. Prior to adjourning the Auction, the Debtor, in the exercise of its business judgment, shall make a determination of the Successful Bidder and such Successful Bidder shall complete and execute all necessary documents. Bids made after the adjournment of the Auction shall not be considered by the Debtor and the Auction shall not be re-opened. The Debtor will ask the Court for a hearing to approve the sale to the Successful Bidder to be held at the first available date the Court has after the adjournment of the Auction.

**B.**  <u>**Proposed Notice of the Sale Hearing**</u>

 30. Pursuant to Rule 2002(a) of the Federal Rules of Bankruptcy Procedure, the Debtor is required to provide its creditors with 21 days' notice of the Sale Hearing. Pursuant to Bankruptcy Rule 2002(c), such notice must include the date, time and place of the Auction and the Sale Hearing, and the deadline for filing any objections to the relief requested herein.

 31. The Debtor will serve a notice containing the information required by Bankruptcy Rule 2002(a) in substantially the form attached hereto as **Exhibit "C"** (the "Sale Notice"). The Sale Notice will be served on those parties indicated on the Debtor's master service list and those

parties indicated on the Debtor's creditor matrix. The Debtor proposes to publish the information contained in the Sale Notice in such publications as the Debtor so chooses. The Debtor will promptly file notice of such publication with the Court.

32. The Debtor submits that the notice of the Sale Motion, the Auction, and the Sale Hearing as provided for herein complies fully with Bankruptcy Rule 2002 and constitutes good and adequate notice of the sale of substantially all of their assets and the proceedings with respect thereto. Therefore, the Debtor respectfully requests that the Court approve the notice procedures described herein.

## V.
## AUTHORITY

### The Sale of the Assets and the Bidding Procedures

33. Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. §363(b)(1). Section 105(a) of the Bankruptcy Code provides in pertinent part that the "[t]he Court may issue any order, process, or judgment that is necessary and appropriate to carry out the provisions of this title." 11 U.S.C. §105(a).

34. The paramount goal of any proposed sale of property of a Debtor is to maximize the proceeds received by the estate. *See, e.g., Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (Bankr. S.D.N.Y. 1992) ("It is a well established principle of bankruptcy law that the Debtor's duty with respect such sale is to obtain the highest price or greatest overall benefit possible for the estate.)

35. To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate

and thus are appropriate in the context of bankruptcy sales. *See e.g. id.* (noting that such procedures "encourage bidding and maximize the value of the Debtors' assets").

36. The Debtor believes that the Bidding Procedures proposed herein establish the parameters under which the value of the Assets may be tested at the Auction. Such procedures will increase the likelihood that Debtor's estate will receive the greatest possible consideration for the Assets because they will ensure a competitive and fair biding process.

### **The Break-Up Fee and Expense Reimbursement**

37. In connection with the Auction, the Court should authorize the Debtor to pay the Break-Up Fee and Reimbursement Amount identified herein in the event that SCG is outbid at the Auction. In *Capline Corp. v. O'Brien Envt'l. Energy, Inc. (In re O'Brien Envt'l. Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999), the Untied States Court of Appeals for the Third Circuit held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context. Accordingly, to be approved, bidding incentives must provide some postpetition benefit.

38. The *O'Brien* Court identified at least two instances in which bidding incentives may provide benefit to the estate. First, benefit may be found if the "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id*. at 537. Second, when the availability of bidding incentives induce a bidder to research the value of the Debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the Debtor is sold will reflect its true worth." *Id*.

39. The proposed Break-Up Fee is appropriate under an "administrative expense" standard. Upon information and belief, without the assurance of the Break-Up Fee, the stalking horse offer would not have been made by SCG. The Break-Up Fee has induced SCG to carefully analyze the value of the Assets and to submit a bid that will serve as a minimum bid upon which other bidders can rely. SCG has provided a benefit to the bankruptcy estate by increasing the likelihood that the consideration paid for the Assets will reflect their true worth.

40. The Debtor's ability to offer the Break-Up Fee will provide the Debtor with the potential of even greater benefit to the bankruptcy estate. Thus, the Break-Up Fee provision should be approved.

## VI.
## CONCLUSION

WHEREFORE, Debtor respectfully requests that the Court (i) enter an order (I) Approving the Form of Stalking Horse APA, (II) Approving Bidding Procedures for an Auction of Debtor's Assets, (III) Scheduling the Date for the Auction, (IV) Approving the Form of the Proposed Notice of Auction and Sale Hearing, and (V) Setting Deadlines to Object to the Sale of the Assets, and (ii) grant the Debtor such other and further relief as is just and proper.

Dated: September 17, 2010.

Respectfully submitted,

**OKIN ADAMS & KILMER LLP**

By:  /s/ *Christopher Adams*
 Christopher Adams
 Texas Bar No. 24009857
 Email: cadams@oakllp.com
 M. Renee Moxley
 Texas Bar No. 24065799

Email: rmoxley@oakllp.com
1113 Vine St. Suite 201
Houston, TX  77002
Tel:  (713) 228-4100
Fax:  (888) 865-2118

**PROPOSED ATTORNEYS FOR
CRYPTOMETRICS, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been served on the parties listed in the attached Service List via electronic means as listed on the Court's ECF noticing system or by regular U.S. First Class Mail on this 17th day of September, 2010.

*/s/ Christopher Adams*
Christopher Adams