IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § § | Chapter 11 |
| CRYPTOMETRICS, INC., | § § | |
| Debtor. | § | CASE NO. 10-53622 |

**DEBTOR'S MOTION UNDER 11 U.S.C. §§ 105(a), 361, 364 AND FED. R. BANKR. P. 2002, 4001 AND 9014 (I) AUTHORIZING DEBTOR TO INCUR POST-PETITION SECURED INDEBTEDNESS AND (II) APPROVING USE OF CASH COLLATERAL**

**THIS PLEADING REQUESTS RELIEF THAT MAY BE ADVERSE TO YOUR INTERESTS.**

**IF NO TIMELY RESPONSE IS FILED WITHIN TWENTY (21) DAYS FROM THE DATE OF SERVICE, THE RELIEF REQUESTED HEREIN MAY BE GRANTED WITHOUT A HEARING BEING HELD.**

**A TIMELY FILED RESPONSE IS NECESSARY FOR A HEARING TO BE HELD.**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

CryptoMetrics, Inc., debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Debtor"), files this Motion Under 11 U.S.C. §§ 105(a), 361, 364 and FED. R. BANKR. P. 2002, 4001 and 9014 (I) Authorizing Debtor to Incur Postpetition Secured Indebtedness and (II) Approving Use of Cash Collateral (the "Motion"). In support of the Motion, the Debtor respectfully represents as follows:

**I.
JURISDICTION**

1. This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

# II.
# BACKGROUND

**A.     Business, Corporate and Financial Overview**

2.     CryptoMetrics, Inc. ("CryptoMetrics" or the "Debtor") is a biometric security company with offices currently in San Antonio, Texas. The Debtor previously had offices in Tuckahoe, New York. The Debtor is a holding company that owns one-hundred percent of the voting stock in two operating subsidiaries – (i) NextGenID, Inc. ("NextGen"), a Delaware Corporation, and (ii) CryptoMetrics Canada Incorporated ("CCI"), a corporation incorporated under Canadian law. From 2002 through 2008, the Debtor raised more than $60,000,000 in equity and debt from investors. Numerous rounds of financing occurred and the Debtor, based on available records, has approximately 400 shareholders located around the world. The Debtor is not publicly traded on any stock exchanges.

3.     Prior to the involvement of current management, significant sums of money were paid out to agents and others persons around the world that appear at least to have been wasted funds and perhaps subsidized illegal activities. These payments are the subject of criminal investigations of the Debtor and certain individuals by the US Department of Justice, the FBI and the Royal Canadian Mounted Police. By November 2009, the Debtor had no cash, had significant debt and had very little to no revenue. Given the precarious financial condition of the Debtor, the pending investigations, and pursuant to an order of the Delaware Chancery Court, the Debtor held a special shareholders meeting on November 30, 2009. To the best of the Debtor's knowledge this was the first shareholder meeting held even though the Debtor had been conducting business for many years. At the November shareholders meeting, Thomas O'Neill, Michael Vitale and Danny Mills were elected as Directors of the Debtor (the "Board"). Mr. O'Neill was subsequently appointed as Chairman and Treasurer, Mr. Vitale as Secretary, and

Mr. Mills as President of the Debtor. These individuals continue to serve as members of the Board and as officers of the Debtor. John-Peter Bradford, a consultant to the Debtor's Canadian subsidiary, was originally appointed as a Director at a Board meeting that immediately followed the shareholders' meeting, however, he resigned at the end of February due to health reasons. The Board has requested that Mr. Bradford resume his duties as a Director and rejoin the Board and act as its chief restructuring advisor. On September 16, 2010, at a special meeting of the Board, Mr. Bradford was reappointed to the Board of Directors.

4. Since November 30, 2009, the officers and directors of the Debtor have undertaken the task of exploring alternatives for reorganizing, restructuring and recapitalizing of the Debtor. The Board has been actively engaged in investigating issues related to the apparent failure and insolvency of the Debtor. During this time, the Debtor had been pursuing all aspects of an out-of-court restructuring process, including attempts to bring short-term capital into the Debtor to allow for time to initiate a financial and operational restructuring. The Board's work revealed that the Debtor has significant outstanding debt, no material operations, and several large pending and threatened litigation claims. There are also the pending investigations discussed above by the US Department of Justice, the FBI and the Royal Canadian Mounted Police related to possible violations of the Foreign Corrupt Practices Act. These investigations have cast a cloud over the Debtor.

5. Concurrently with the Board's investigations, management has been actively trying to stabilize the business of the Debtor's operating subsidiaries -- NextGen and CCI -- with a view to making the Debtor viable. Management has concluded that the Debtor's operating subsidiaries have the potential to be successful if (i) their debts and the Debtor's debts can be restructured, (ii) the ongoing criminal investigations can be resolved, and (iii) the employees can

be assured ongoing and uninterrupted payment of wages and benefits, which means, among other things, acquiring sufficient working capital to ensure the solvency of the operating subsidiaries, and fund their operations for the near term.

6. In January 2009, the Debtor, under its prior management, entered into a loan agreement with MBRO Capital, LLC (the "MBRO Loan") whereby the Debtor borrowed $2,000,000 from MBRO secured by the entirety of the assets of the Debtor, as well as the personal guarantees of the two founders and co-CEOs. These personal guarantees were secured by the guarantors' respective stock in the Debtor. The MBRO Loan was intended to be a short term loan with the intention that it be repaid in less than 90 days. However, after one extension, the note went into default and remains in default today. MBRO filed suit against the former CEO, the Debtor's then legal counsel and others claiming, among other things, fraud and misrepresentation by the Debtor and the CEO. MBRO was prepared to foreclose on its collateral which secured the note in January of 2010. In an effort to avoid the foreclosure, Security Concepts Group, LLC ("SCG") purchased substantially all of the Debtor's secured debt. SCG is an entity owned by certain shareholders, officers and directors of the Debtor. Tom O'Neill, who is Chairman and Treasurer of CryptoMetrics, as well as a shareholder of CrytpoMetrics, is also a manager of SCG and owns approximately 5% of SCG. Danny Mills, who is President of CryptoMetrics, is also a manager of SCG and owns approximately 8% of SCG.

7. SCG purchased substantially all of MBRO's interest in the MBRO Loan. SCG also purchased the seller's note made by the Debtor to BioAccess Holdings, LLC in connection with the Debtor's acquisition of Nextgen (the "NextgenID Loan"). As of the Petition Date, the outstanding balance of the MBRO Loan including unpaid interest and fees is approximately $3,423,170 and the outstanding balance of the NextgenID Loan including unpaid interest and

fees is approximately $3,481,364. Both loans continue to be in default and are collateralized by the assets of the Debtor and Nextgen, respectively and, as such, represent the primary secured debt of the Debtor. Among other things, the acquisition of the MBRO Loan by SCG averted imminent foreclosure and allowed the Debtor time to pursue other strategies.

8. SCG has also loaned funds directly to the operating subsidiaries and to the Debtor. Those funds have been used to pay expenses, salaries, consulting fees, travel expenses and the vendor payables of the subsidiaries necessary to maintain current workflow, as well as Debtor legal and consulting fees and other miscellaneous corporate expenses. SCG has continued to fund the day-to-day operating expenses for the operating subsidiaries, CCI and Nextgen, on a month-by-month basis, allowing the Debtor the time to seek viable alternatives to bankruptcy. An amount of $500,000 was loaned by SCG to CCI on an unsecured basis; in addition, approximately $3,600,000 was loaned by SCG to Nextgen and CCI on a secured basis, with a guarantee provided by the Debtor. CCI's assets and the Debtor's assets were pledged as security for this loan and guarantee, respectively. In total, since March 2010, SCG has funded approximately $3,600,000 directly to the Debtor's operating subsidiaries in an effort to stabilize their businesses. With the exception of the initial $500,000 loan to CCI, all funds loaned by SCG are secured by the assets and stock of the subsidiaries and guaranteed on a secured basis by the Debtor. SCG's security interests are secondary in priority to the security interests granted by the Debtor in connection with the MBRO and Nextgen loans.

**B.** **Other Debtor Related Matters**

  *1.* *CryptoMetrics Canada, Inc. ("CCI")*

9. On March 29, 2010, CCI filed with the Canadian bankruptcy court for a "Proposal" under the Bankruptcy and Insolvency Act ("BIA") in Canada. This began a process

which allowed CCI a time to negotiate settlements with its unsecured creditors while maintaining control of its operations. CCI retained a Trustee to oversee the process and sent required notices to all known creditors. The total CCI debt subject to the proposal process exceeded $4,200,000 (including past wages due to employees).

10. On June 11, 2010, CCI filed its Proposal and a meeting of creditors was held on June 30, 2010. At that meeting, CCI's creditors approved the Proposal which allows CCI to settle the obligations covered by the Proposal for approximately ten cents on the dollar. The Canadian Bankruptcy Court approved the Proposal in early August 2010 and CCI is now operating with relief obtained from the completion of the Proposal process.

11. As a part of the BIA Proposal process, efforts were made to retain control of and protect the intellectual property ("IP") and know-how associated with CCI. As such, based on the advice of Canadian counsel, NextgenID-Canada, Inc. ("Nextgen-Canada") was formed as a wholly owned subsidiary of Nextgen. Nextgen-Canada entered into a license agreement with CCI under which Nextgen-Canada licenses all technology necessary for the go forward operations from CCI. Payments under the license agreement from Nextgen-Canada to CCI will fund the payments to CCI's creditors covered by the Proposal. It is important to note that no IP or other assets have been transferred out of CCI. Rather these assets are serving as collateral for the loans SCG and Nextgen have made and intend to make to CCI in order to keep CCI's operations going. If those loans are not repaid, SCG and Nextgen will have the right to foreclose on the collateral.

12. At this time there is no intention of having to utilize NextgenID-Canada as the go-forward entity, as CCI has resolved most of its issues with creditors through completion of the Proposal process. Accordingly, NextgenID-Canada will remain as a shell company for the

foreseeable future.

### 2. *United Arab Emirates*

13. Prior management focused almost all of their efforts on obtaining a contract to supply the Debtor's technology to the United Arab Emirates. Prior management claimed that they had secured a contract worth "hundreds of millions" of dollars with the UAE Ministry of Interior ("MOI"). The existence of this "contract" was used as the basis for raising significant amounts of capital and for a failed reverse merger by the Debtor with a public shell company in 2008.

14. As it turns out, there are significant issues with this contract, and CryptoMetrics' business efforts in the UAE. Chief among these is the DoJ investigation into alleged violations of the Foreign Corrupt Practices Act. Additionally, the contract which was to generate the UAE business was negotiated and entered into by Robert Barra ("Barra") and Joel Shaw ("Shaw"), both former management of the Debtor, through BioDentity Systems LLC ("BioDentity") of the UAE, and is very one sided in favor of the MOI. The contract has a 25-year term and provides the MOI the right to use Debtor's technology. However, the MOI is not locked in by this contract and is free to use technology supplied by others, at their sole discretion. Moreover, whether or not the MOI exercised its right to purchase competing technology, the contract prohibits the Debtor from selling its technology anywhere in the Middle East North Africa ("MENA") region except through BioDentity. BioDentity was incorporated in Abu Dhabi at the direction of Barra and Shaw to be ultimately owned 51% by UAE interests and 49% by the Debtor's shareholders. While the record is not entirely clear, upon information and belief, CryptoMetrics' shareholders' interest is now held 80% by Barra and 20% by Shaw. Thus, whatever benefits were to flow from the UAE business to the Debtor were structured so they

would be controlled by Barra and Shaw, not by the Debtor.

15. It is now believed that the MOI has no intention of moving forward with the Debtor's technology and is focused on obtaining repayment of a $5,000,000 unsecured loan it made to the Debtor in May 2008. The current management of the Debtor has been negotiating with representatives of the MOI with the following objectives in mind:

- Termination of the existing agreement, and other related agreements, thus freeing the Debtor of its restrictive provisions; and
- Allowing the MOI to sell the $5,000,000 loan to a third party which would permit the MOI to recoup the amount of its loan, but conditioning such sale on the buyer agreeing to extend the term of the loan for an additional 18 months.

16. This proposal has been pending before the MOI's representatives for over five months and still has not been accepted or approved by them. Although not yet confirmed, upon information and belief, prior CryptoMetrics management (Barra, Shaw and others) and certain other shareholders are taking steps in the UAE which are interfering with the conclusion of these negotiations. The $5,000,000 debt to the MOI, which is now due at any time on demand, was a significant factor in the decision to file for bankruptcy protection. The Debtor believes that it may have avoidance claims against the MOI related to the incurrence of the $5,000,000 debt to the MOI and expressly reserves the right to assert these claims on behalf of its estate.

C. **Litigation Against the Debtor**

17. The Debtor is a defendant in three lawsuits, one by the past CFO seeking $3,000,000 in damages, one by an agent from the UAE seeking $25,000,000 in damages, and the third by one of the several law firms not paid by prior management. The lawsuits are problematic in that the Debtor does not have the time and money to respond to them, and the Debtor would be unable to satisfy any significant judgment in any one of these suits, should the plaintiffs prevail on their claims. In addition to these three lawsuits, other litigation may be

brought by other creditors, including the MOI seeking repayment of its $5,000,000 unsecured loan as noted above.

### D. Decision to File Chapter 11

18. In summary, the Debtor has been facing significant challenges. The principal challenge facing the Debtor continues to be its need to raise additional funds, and the method by which that might be done. The Debtor has pursued alternatives to bankruptcy for the past 10 months but has been unsuccessful on all accounts. Potential investors contacted by the Debtor during the several months leading up to the bankruptcy filing have made it clear that they will not invest in the Debtor unless the Debtor can cleanse itself of many (if not all) of the claims and contingencies it faces. Having taken all available steps to avoid bankruptcy, the Board determined that bankruptcy is the only viable alternative, and, as such, directed the Debtor to initiate a chapter 11 bankruptcy proceeding in San Antonio, Texas.

### E. Proposed Sale

19. The Debtor has determined that the only way to bring value to the stakeholders of the Debtor is to sell the Assets of the Debtor. SCG has offered to buy the subsidiaries (Nextgen and CCI), along with any related intellectual property of the Debtor, for the value of its secured claims against the Debtor (approximately $10.5 million) plus a cash payment in the amount of $150,000. An "Asset Purchase Agreement" has been executed by SCG. Moreover, the Debtor has been actively seeking other viable purchasers of the subsidiaries and the Debtor is seeking Court approval for an auction in November, 2010. The Debtor believes that this auction and sale process provides the greatest opportunity to maximize value for stakeholders.

20. It is important to note that SCG could have sought to foreclose its liens on the Debtor's Assets for the value of its claims. However, SCG instructed the Debtor that it would

prefer to purchase the subsidiaries out of bankruptcy in an effort to maximize value to the stakeholders of the Debtor. This alternative was viewed as very beneficial by the Board of the Debtor since a foreclosure would likely have yielded no value to stakeholders. Moreover, the Debtor requested that SCG provide a cash component to its bid and, in response to the Debtor's request, SCG agreed to bid its claims plus $150,000 in cash. In consideration for the credit bid of SCG's secured claims and the cash payment from SCG to the Debtor, the Debtor proposes to release any and all claims against SCG as part of this transaction. The cash portion of SCG's bid is viewed as extremely valuable to the Debtor since the Debtor does not have any other available cash with which it could fund litigation and pursue various claims for the benefit of its stakeholders.

### F. Claims of the Debtor

21. The Debtor believes that there are certain claims that exist against various parties, including former management. The Debtor's Plan proposes to preserve those claims for stakeholders. Moreover, it is anticipated that the $150,000 in cash provided by SCG (or more if there are overbids) will be used to help fund such litigation for the benefit of the Debtor's stakeholders.

### G. Liquidating Plan

22. The Plan proposes to sell the majority of the Debtor's Assets to the highest bidder and reorganize the Debtor as a "Liquidating Debtor." Post-Effective Date, the Debtor's equity interests will be cancelled and new equity interests in the Liquidating Debtor will be issued to the Plan Agent. The Plan Agent is charged with (i) pursuing any other remaining assets of the Debtor such as legal actions and claims (as described above), (ii) monetizing such assets, legal actions and claims for the benefit of stakeholders, (iii) making distributions in accordance with

the Plan, and (iv) winding-down the Liquidating Debtor upon completion of the case. The Debtor will disclose the identity of the Plan Agent within 10 days prior to the Confirmation Hearing.

### III.
### RELIEF REQUESTED

23. By this Motion, the Debtor seeks this Court's authorization under section 364(c) of the Bankruptcy Code to obtain postpetition debtor-in-possession financing (the "DIP Financing") from SCG as well as authority to use cash collateral ("Cash Collateral"). Specifically, the Debtor requests that this Court approve the DIP Financing under the proposed terms and conditions set forth herein and to be set forth in more detail in the DIP Credit Agreement, which will be submitted at least five days prior to the final hearing on the DIP Financing (the "DIP Credit Agreement" and together with any other documents required by SCG to provide the DIP Financing, the "DIP Loan Documents").

24. The Debtor seeks entry of a final order (the "Final Order") authorizing Debtor to borrow from SCG up to $150,000 on a final basis and authorizing Debtor's use of Cash Collateral. The funds to be extended under the Final Order and use of Cash Collateral will provide the Debtor with operating capital to allow it to fund its operations in bankruptcy consistent with the cash flow projections shown in the budget attached hereto as Exhibit "A."

25. SCG has proposed to lend the funds requested by the Debtor pursuant to the Final Order. The Debtor, therefore, seeks to obtain a hearing to consider entry of the Final Order authorizing the DIP Financing on a final basis.

26. The Debtor has determined that the DIP Financing and use of Cash Collateral is vital to the Debtor's ability to operate in chapter 11 and for the Debtor's successful reorganization. Without access to the DIP Financing and use of Cash Collateral, the Debtor will

not have sufficient funds to enable it to finance its business operations and costs associated with this bankruptcy case. Consequently, the Debtor's continued viability and ability to reorganize depends heavily upon the approval of the DIP Financing.

27. The Debtor submits that the terms of the DIP Financing are fair and reasonable under the circumstances. SCG is offering the DIP Financing with the view that this financing will provide necessary working capital to allow the Debtor to continue to operate until a plan can be confirmed. The Debtor therefore requests that this Court approve the use of DIP Financing and use of Cash Collateral to allow the Debtor to continue to operate.

## IV.
## PROPOSED TERMS OF THE DIP FINANCING

28. SCG has proposed the following terms for the DIP Financing:

**Amount:** $150,000

**Term:** The earlier of (i) four months from the closing date ("Maturity Date"), subject to Borrower's request for up to two one month extensions so long as the Borrower is in compliance with the loan agreements and is in the process of soliciting approval for a plan of reorganization and obtaining approval of the Asset Sale (defined below), or (ii) upon the confirmation of a plan of reorganization or approval of the Asset Sale.

**Interest Rate:** LIBOR plus 4% per annum, payable monthly in arrears.

**Collateral and Priority:** A security interest pursuant to section 364(c) of the Bankruptcy Code in all of Borrower's now owned or thereafter acquired property and assets, and all proceeds and products thereof, including without limitation the real estate owned by the Borrower. The obligations will also be granted super-priority administrative expense status under section 364(c)(1) of the Bankruptcy Code, having priority over any and all other administrative expense of any kind.

**Covenants/ Plan**

**Agreement:** The Borrower shall file its (i) disclosure statement and plan of reorganization (the "Agreed Plan"); and (ii) motion to approve a sale pursuant to Section 363 of the Bankruptcy Code of substantially all of Borrower's assets to Lenders, specifically including Borrower's ownership interests in its subsidiaries (the "Asset Sale") on the same day it files its voluntary petition for relief (the "Petition Date") under the Bankruptcy Code. All pleadings filed by Borrower must be in a form acceptable to the Lenders. The Agreed Plan shall provide mutual releases among the Borrower and Lenders. The bidding procedures associated with the Asset Sale will set forth a timeline acceptable to the Lenders for soliciting other bids and holding an auction. Included with the sale motion and bidding procedures, Borrower will also file a stock purchase agreement pursuant to which the Lenders will be the staking horse bidder (the "Stalking Horse SPA"). The Stalking Horse SPA, sale motion, and bidding procedures shall provide that the Lenders be authorized to credit bid any secured amounts owed for pre-Petition Date obligations plus any secured amounts outstanding under the DIP Facility at the time of the auction. The Stalking Horse SPA, sale motion, and bidding procedures shall also provide the Lender with a break-up fee (the "Break-up Fee") equal to 1.5% of the initial staking horse sale price plus any and all expenses of the Lenders, including but not limited to, any attorneys fees and expenses. Borrower agrees proposing or supporting any plan of reorganization that is inconsistent with the Agreed Plan and Asset Sale shall constitute an immediate event of default under the DIP loan. Additionally, a default by the Borrower under the DIP Loan Documents shall constitute a default by the borrowers under Lender's loan documents with CryptoMetrics Canada, Inc. ("CCI") and NextgenID, Inc. ("Nextgen"). On the Petition Date, Borrower shall file a motion for approval of the DIP loan. The Debtor shall request an expedited hearing from the bankruptcy court on the motion. The order approving the DIP loan shall include the Borrower's agreement regarding filing and consenting to the Agreed Plan and all related pleadings, including the motion to approve the Asset Sale. An order shall be entered approving the DIP loan on a final basis no later than thirty (30) days after the Petition Date.

**Events of Default:** Customary and appropriate for financing of this type and for this transaction in particular (subject to customary and appropriate grace periods), and customary bankruptcy defaults, including, without limitation (i) appointment of a trustee or examiner with expanded powers, (ii) filing of a plan of reorganization by the Borrower that is not consistent with the Agreed Plan, (iii) conversion of the chapter 11 case to chapter 7 of the Bankruptcy Code, (iv) the DIP order being stayed, amended or modified or ceasing to be in full force and effect during the chapter 11 case, (v) filing of a motion seeking non-consensual use of cash collateral, (v) loss of senior executives, (vii) the grant of any super-priority administrative expense

claim or any lien which is pari passu with or senior to those of the Lenders, (viii) failure of the Borrower to obtain the interim and final DIP orders at the times and in the form described below, (ix) failure to comply with the DIP Budget (subject to any agreed variances), and (x) third party relief from automatic stay with respect to collateral having a value in excess of $100,000.

The above terms are proposed and are subject to change based on the final DIP Credit Agreement that is currently in negotiation but will be submitted at lease five days prior to the final hearing.

## V.
## ARGUMENT AND AUTHORITY

29. Section 364(c) of the Bankruptcy Code provides:

(c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –

(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2) secured with a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien.

30. Bankruptcy Rule 4001(c) governs the procedures for obtaining authorization for

postpetition financing and provides:

(c) Obtaining Credit

(1) <u>Motion; Service</u>. A motion for authority to obtain credit shall be made in accordance with Rule 9014 and shall be served on any committee elected pursuant to § 705 or appointed pursuant to § 1102 of the Code or its authorized agent, or, if the case is a chapter 9 municipality case or a chapter 11 reorganization case and no committee of unsecured creditors has been appointed pursuant to § 1102, on the creditors included on the list filed pursuant to Rule 1007(d), and on such other entities as the court may direct. The motion shall be accompanied by a copy of the agreement.

(2) <u>Hearing</u>. The court may commence a final hearing on a motion for authority to obtain credit no earlier than 15 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 15 day period expires, but the court

may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

(3) <u>Notice</u>. Notice of hearing pursuant to this subdivision shall be given to the parties on whom service of the motion is required by paragraph (1) of this subdivision and to such other entities as the court may direct.

31. The Debtor requires the proposed DIP Financing and use of Cash Collateral in order to pay ongoing expenses in the ordinary course of business plus the costs associated with the bankruptcy filing. Without approval of the DIP Financing and use of Cash Collateral, the Debtor's ability to operate its business will be severely impaired and the Debtor will ultimately have to cease business operations. Obviously this would have a severe negative impact on the Debtor's going concern value and ability to successfully create value for all creditors. The Debtor's business as a going concern has a value far in excess of any value that might be obtained in a chapter 7 liquidation. Accordingly, the Debtor requests that this Court approve the DIP Financing and approve Debtor's use of Cash Collateral.

## VI.
## FINAL HEARING

32. The Debtor requests that this Court schedule the final hearing as soon as this Court's schedule permits, following 15 days after service of this Motion.

WHEREFORE, the Debtor respectfully requests that this Court (i) authorize the Debtor to execute and deliver the DIP Loan Documents and perform such other and further acts as may be necessary in connection therewith; (ii) approve Debtor's use of Cash Collateral; (iii) set a final hearing as soon as this Court's schedule permits, following 15 days after service of this Motion for approval and entry of a final order; and (iv) grant the Debtor such other and further relief as this Court may deem just and proper.

Respectfully submitted this 17th day of September, 2010.

**OKIN ADAMS & KILMER LLP**

By:    /s/ *Christopher Adams*
     Christopher Adams
     Texas Bar No. 24009857
     Email: cadams@oakllp.com
     M. Renee Moxley
     Texas Bar No. 24065799
     Email: rmoxley@oakllp.com
     1113 Vine St. Suite 201
     Houston, TX 77002
     Tel: (713) 228-4100
     Fax: (888) 865-2118

**PROPOSED ATTORNEYS FOR CRYPTOMETRICS, INC.**

## **CERTIFICATE OF SERVICE**

     I hereby certify that a true and correct copy of the above and foregoing instrument has been served on the parties listed in the attached Service List via electronic means as listed on the Court's ECF noticing system or by regular U.S. First Class Mail on this 17th day of September, 2010.

                                */s/ Christopher Adams*
                                Christopher Adams